(No. 70861.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. ARTHUR J. SCHOTT, Appellee.

*Opinion filed October 31, 1991.*

Neil F. Hartigan, Attorney General, of Springfield, and Cecil A. Partee and Jack O'Malley, State's Attorneys, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Renee Goldfarb, Assistant State's Attorney, and Margaret M. Regan, Special Assistant State's Attorney, of counsel), for the People.

Julius Lucius Echeles and Frederick F. Cohn, of Chicago, for appellee.

JUSTICE MORAN delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant, Arthur J. Schott, stepfather of the complainant herein, was convicted of aggravated indecent liberties with a child (Ill. Rev. Stat. 1983, ch. 38, par. 11—4.1(b)(1)(A)), sentenced to 10 years' imprisonment and fined $6,750. Defendant appealed and by a written Rule 23 order, the appellate court reversed his conviction, finding the evidence was insufficient to prove him guilty beyond a reasonable doubt. (200 Ill. App. 3d 1109 (unpublished order under Supreme Court Rule 23).) This court allowed the State's petition for leave to appeal (134 Ill. 2d R. 315).

The sole issue presented for review is whether a victim's testimony must satisfy the sex-offense standard of review, that such testimony be either clear and convincing or substantially corroborated, to sustain a sex-offense conviction where the sufficiency of the evidence is challenged on appeal.

At trial, the first witness called by the State was Yvonne Jones, complainant's former second-grade teacher, who testified as follows: around the end of May 1985, a teacher's aid delivered a note to her that had been taken from the complainant; drawn on the note was a picture of an erect penis and the words—"Do you want to f***"; she confronted complainant about the

note but complainant denied that she had written it; a few minutes later, complainant admitted that she drew the picture and wrote the note; and approximately one week later, complainant told her that she felt as though she was pregnant and that the defendant had put his penis into her "private parts."

After complainant was adjudged competent to testify, the State elicited the following testimony from her: she stated that her date of birth was April 9, 1977; the defendant sexually molested her one evening around her birthday in a basement apartment located at 2638 W. Evergreen; she resided in this apartment with her mother, two brothers and the defendant; on the evening in question, the defendant woke her up so that she could use the bathroom because she had "wet" the bed; she went to the bathroom, removed her clothes and stepped into the tub; defendant then told her to turn off the water and he then put his finger into her vagina; approximately one week later, she was left alone with the defendant in the living room of the basement apartment; defendant told her to take off her clothes, lay on a bed and bend her knees; after doing so, defendant put his penis halfway into her vagina and she screamed; after she screamed defendant stopped and told her to get dressed; and towards the end of the school year, she told her second-grade teacher that she was abused by the defendant.

Defense counsel then subjected complainant to an exhaustive cross-examination. As a result, many inconsistencies were presented, including the location of where the offense had occurred: complainant stated that the two instances of sexual abuse that she had testified to on direct examination occurred at 2638 W. Evergreen; yet, her prior testimony from a juvenile court proceeding was introduced where she stated that the only thing defendant did to her at 2638 W. Evergreen was that he kissed her and grabbed her "private" and that "all of the other stuff

happened at 2629." (The record shows that the defendant owned two apartment buildings, one at 2629 W. Evergreen and the other at 2638 W. Evergreen.) Her juvenile court testimony as to the location of the alleged offense was as follows:

"A. Downstairs at 2629 West Evergreen, because the bedroom was where the TV was and stuff, because it was not too big in the basement, so he told me to lay on the bed and I did, and he [said] open your legs, and I did, and he put his penis inside my vagina, only halfway, though."

After her juvenile court testimony was introduced, the trial judge proceeded to ask the complainant the following questions:

"THE COURT: *** The apartment at 2629, was it a basement apartment?

A. Well, there was a basement downstairs. That was ours, and we lived on the top, the first floor.

THE COURT: And 2638 was a basement apartment?

A. Yes.

THE COURT: So, 2629, you lived on the first floor?

A. Yes.

THE COURT: At 2629, where was the television?

A. In the front of the house.

THE COURT: On the first floor?

A. Yes.

THE COURT: At 2638, where was the television?

A. The front of the house.

THE COURT: In the basement?

A. Yes."

Complainant's answers to the judge's questions in the preceding passage tended to show that she confused the address of the building in which she was abused, 2638, with the address of another building that the defendant owned, 2629.

During the cross-examination, she was also contradicted as to the time of year that the alleged offense occurred. She said that there were no leaves flying around

at the time the defendant put his penis into her vagina. Yet, her prior juvenile court testimony was introduced and in that proceeding she testified as follows:

> "Q. And how many times did that happen to you?
> A. Once.
> Q. And what was the address?
> A. 2629.
> Q. Do you know when that was?
> A. During the spring and fall.
> Q. When?
> A. The fall, in the fall.
> Q. How do you know it was in the fall?
> A. Because all kinds of leaves were flying around.
> Q. Pardon?
> A. Leaves were flying around."

Defense counsel's cross-examination established that complainant had previously lied to a judge when she told him that her uncle Mark put his penis inside of her. She explained that she made the story up about her uncle "[b]ecause [she] was angry[ ]" and "because my uncle had gave [sic] me some money, and he took it away from me." Complainant also gave the following testimony on cross-examination:

> "Q. Did you ever lie at Larkin [Children's Home] or any place else just to see what people would do?
> A. Not just to see what people would do, I lie a lot, yes.
> Q. You lie a lot?
> A. Yes."

Complainant also stated that she previously accused two boys, Brian and Antoine, of sexually abusing her. Moreover, she testified that her uncle Mark's friend, Steve, put his finger into her vagina when her mother left the defendant and she moved in with other relatives.

The cross-examination further disclosed that complainant was a sexually aberrant child. When she first moved in with her mother, she made her younger

brother "suck on [her] private." She stated that she learned this sexual act "from a couple kids" in Arlington Heights (complainant lived in Arlington Heights with her grandmother before moving in with her mother, her two brothers and defendant). She also said, "the thing that I had my brother do on the toilet was called a cherry lick." However, her testimony was inconsistent with her prior juvenile court testimony where she had stated that she made up the story of "[w]hat William did to me on the toilet." Moreover, she denied on cross-examination that she had her brother, William, put his "private part" in her or another girl. This statement was also inconsistent with her prior juvenile court testimony where she had stated that "I had him put his private in the little girl, and then he put it in me." Complainant testified that, while living in Arlington Heights, she would take her clothes off in private and then show her "private parts" to other people.

Her juvenile court testimony, introduced during cross-examination, revealed that complainant observed her uncle engage in sexual activity. However, she answered "no" when asked by defense counsel whether she ever saw her uncle Mark and aunt Eva engage in sex. This statement was inconsistent with complainant's juvenile court testimony where she testified as follows:

"Q. Did you see Eva and Mark, what did you see Eva and Mark do?
A. He put his private inside of her.
Q. You saw him do that?
A. (Nodding in the affirmative)
Q. How many times did you see that?
A. Once."

Complainant was also contradicted during cross-examination about the number of times she was molested by the defendant. She denied ever telling anyone that the defendant had molested her everyday or almost eve-

ryday. However, she had given the following testimony in juvenile court:

"Q. Now, these incidentss [sic] when [the defendant] would molest you, did you ever tell anybody that these happened on [sic] almost every day?

A. That is [sic] was happening every day?

Q. Yes, almost every day.

A. Did I tell anybody?

Q. Yes.

A. My teacher and my mom, and my best friend. See, before I told my teacher, I talked to my friend about it, and she said it would be best—."

Doctor Sharon Ahart, a pediatrician, gave the following testimony: she physically examined the complainant on December 17, 1985; her physical examination revealed that there was redness on the inside of both of the large lips to the vaginal region and only a partial hymen was present; and based on her physical exam, the history taken from the child and evaluations received from a child psychologist and child development specialist, she diagnosed complainant's condition as child sexual abuse. However, on cross-examination, the doctor could not "say for sure that [the vaginal redness] would be definitely part of the child sexual abuse"; she also stated that the complainant exhibited "psychotic features due to past traumatization"; and she believed that some of the history that she had taken from the complainant was that the complainant was molested night and day. On rebuttal, she explained that it is not unusual for sexually abused children to be borderline psychotic and to make recantations.

Another witness called on behalf of the State was Chicago police officer Peggy O'Connor, who testified that she was assigned to investigate a sexual abuse case involving complainant. She interviewed the complainant, who told her that the defendant engaged in a variety of

sex acts with her. One of the sex acts included an attempt by defendant to insert his penis into her.

The State rested and defendant moved for a directed finding, which the court denied. Nevertheless, the court did point out that the State's case was clearly not strong and that the complainant was very persuasively impeached. Thereafter, defendant proceeded to call a number of witnesses.

Defendant called Chicago police officers Gregory Bernacki and Terrence O'Neil, Chicago police detective Robert Collins, and child welfare specialist Nancy Carlton. Generally, all four witnesses testified that complainant told each of them that she made up the allegations about defendant. Three of the witnesses stated that complainant told them that she accused the defendant because she was angry with him. On cross-examination, complainant denied telling anyone that she was angry with the defendant:

"Q. Well, did you ever tell anyone that you were angry at [the defendant], and that is why you said the things about him?

A. No."

Nancy Carlton testified that the complainant told her that she was not molested by the defendant, but by another person:

"Q. Did you have a conversation with [the complainant] about a man named Steve?

A. Yes.

Q. And what was the sum and substance of the conversation about Steve that [she] told you?

A. Steve was [her mother's] brother and he had molested [her] sexually.

Q. Did [she] tell you specifically anything about whether Steve was the only person who had ever molested her?

A. My [sic] I refresh my memory? She said that only Steve had done this.

Q. And did she tell you anything next about [the defendant]?

A. That [the defendant] had not done it."

Complainant had testified on cross-examination that she did not tell Nancy Carlton that Steve was the only person who had molested her.

Complainant's mother gave the following testimony: after living with her grandmother for two years, complainant returned to live with her; within a month of moving in, she said that she "caught her in the bathroom with my oldest son, William, and she was sitting on the toilet when my son was on his knees ea— her vagina"; about a month later, she saw complainant putting paper clips on a girl's nipples (on cross-examination the complainant denied that she ever put paper clips on the nipples of a little girl); she observed complainant "playing with herself" at least four or five times (on cross-examination the complainant denied that she ever "play[ed] with [her] own private parts"); she also saw complainant sucking the penises of complainant's two brothers; around the end of 1984 or early 1985, she said that complainant told her that her uncle Mark tried to make her suck his penis, but that complainant later told her it was a lie; and complainant told her that defendant abused her, but a day or two later, complainant said that defendant did not abuse her (on cross-examination, complainant admitted that she told her mother that she "lied about [the defendant]") and that she accused the defendant because "[s]he was jealous of the baby, that the baby was getting a lot of attention and she wasn't" (complainant had testified on cross-examination that she was not jealous of the baby); and that the complainant told her some people in Arlington Heights "would do things to her too." On cross-examination, the mother testified that complainant never accused anyone of sexual abuse until

she moved to the basement apartment on Evergreen Street.

Shannon Leahy, investigator for the Illinois Department of Children and Family Services (DCFS), testified that she spoke with the complainant in June 1985 regarding a skull fracture sustained by complainant's infant brother, Joseph. The investigator stated that complainant told her "that she [the complainant] had picked up a flashlight that was on the baby's dressing table and that she had hit the baby in the head twice." The investigator's testimony conflicted with complainant's earlier testimony on cross-examination where she stated that she told Leahy that she did not hit Joseph on the head.

Carolyn Smetters, a DCFS employee, was called as rebuttal witness on behalf of the State. She testified that complainant's mother told her that the defendant "beat her a lot and they put—he raped her, he put his fist up her vagina." Gail Sullivan was also called as a rebuttal witness on behalf of the State to give expert opinion testimony on the subject of counseling sexually abused children. She testified that sexually abused children will wet their bed, have "sexual knowledge that is beyond their years," behave in a "sexually provocative way," and "[t]hey will draw a picture of a man and his nose will look like a penis or they will draw a picture of an animal and the penis will be overly exaggerated." The State and the defendant then rested.

The sex-offense standard of review, that a victim's testimony be clear and convincing or substantially corroborated, has been the law of this State for many years. *People v. Coates* (1985), 109 Ill. 2d 431, 440; *People v. Morgan* (1977), 69 Ill. 2d 200, 206; *People v. Grear* (1969), 42 Ill. 2d 578, 580; *People v. Stagg* (1963), 29 Ill. 2d 415, 421; *People v. Kolden* (1962), 25 Ill. 2d 327, 329; *People v. Parker* (1959), 15 Ill. 2d 508, 510-11; *People v. Pazell* (1948), 399 Ill. 462, 467.

The requirement that a sex-offense victim's testimony be clear and convincing or substantially corroborated in order to sustain a sex-offense conviction developed from Simon Greenleaf's early evidence treatise in which he criticized the kind of evidence typically introduced in rape cases: " 'It is to be remembered, as has justly been observed by Lord Hale, that it [rape] is an accusation easily made, hard to be proved and still harder to be defended by one ever so innocent.' " (*People v. Freeman* (1910), 244 Ill. 590, 594, quoting 3 S. Greenleaf, Evidence §212 (4th ed. 1857).) This evidentiary standard was later made applicable to the crimes of improper liberties with a child (*Freeman*, 244 Ill. at 595) and public indecency (*Grear*, 42 Ill. 2d at 580), and has been generally applied in all sex-offense cases.

The standard has served as a safeguard over the interests of the accused. (*Parker*, 15 Ill. 2d at 510-11.) It appears to have been supported over the years because the court had expressed the following concerns: *Shirwin v. People* (1873), 69 Ill. 55, 59 (it was believed that in many instances women were motivated to make unfounded charges of rape "for revenge, to extort money, [and] as an excuse on their part for a sin of a less odious character"); *Freeman*, 244 Ill. at 594 (juries, as a result of passion or prejudice, may be inclined to convict adults charged with committing sexual crimes against children because such crimes arouse public indignation); *People v. Johnson* (1921), 298 Ill. 52, 55 (convicting someone on the testimony of a child was considered dangerous).

In *People v. Cole* (1990), 193 Ill. App. 3d 990, 997 (Steigmann, J., specially concurring), the appellate court questioned the validity of the special standard of review employed in sex-offense cases. Justice Steigmann, in his concurring opinion, called for the abolishment of the standard because he considered it to be arbitrary, sexist, and inconsistent with recent opinions of this court. (*Cole*,

193 Ill. App. 3d at 998-99 (Stiegmann, J., specially concurring).) It was not too long after *Cole* that the Appellate Court, Fourth District, refused to follow the "substantially corroborative or clear and convincing" standard. In *People v. Roy* (1990), 201 Ill. App. 3d 166, 185, the court stated:

"[T]here is no additional requirement that in a case in which a sex offense is charged the State must, in addition to proving the defendant guilty beyond a reasonable doubt, demonstrate either the evidence is substantially corroborated or the victim's testimony is clear and convincing. The testimony of no other category of crime victim is held to be automatically suspect or to require additional proof beyond the statutory requirements. The time is past to rid the law of this sexist anachronism."

Many decisions have since been handed down by our appellate court in which *Roy* has been followed. *People v. Puhl* (1991), 211 Ill. App. 3d 457; *People v. Casiano* (1991), 212 Ill. App. 3d 680; *People v. Nicholl* (1991), 210 Ill. App. 3d 1001; *In re A.J.H.* (1991), 210 Ill. App. 3d 65; *People v. McCarthy* (1991), 213 Ill. App. 3d 873; *People v. Lemons* (1991), 210 Ill. App. 3d 33; *People v. Meador* (1991), 210 Ill. App. 3d 829; *People v. Byrd* (1990), 206 Ill. App. 3d 996; *People v. James* (1990), 200 Ill. App. 3d 380; *People v. Westfield* (1990), 207 Ill. App. 3d 772.

Nevertheless, two recent appellate court decisions have seemingly not followed *Roy*. See *People v. Hart* (1991), 214 Ill. App. 3d 512, 520 (evidence was sufficient to sustain conviction where trial court could have found complainant's statements were clear and convincing and other evidence corroborated the sexual assault); *People v. Stengel* (1991), 211 Ill. App. 3d 337, 345-46 (for defendant to be proven guilty beyond a reasonable doubt, it was necessary for complainant's testimony to be clear and convincing).

The State maintains that the sex-offense standard should be abolished by this court, thereby leaving one standard governing the sufficiency of the evidence in all criminal appeals. Defendant, citing *People v. McAdrian* (1972), 52 Ill. 2d 250, claims that the State waived this argument by not urging the appellate court to reject the sex-offense standard.

Defendant's argument is that the State, by not seeking the abolishment of the sex-offense standard in the appellate court, has waived any right to bring that issue before this court. Where the appellant in the appellate court does not raise an issue in that court, the issue will not be considered on appeal to this court. (*Hammond v. North American Asbestos Corp.* (1983), 97 Ill. 2d 195, 209.) However, this principle is inapplicable to the appellee (the State here) in the appellate court because it did not make the issues in that court. "Where the trial court is reversed by the Appellate Court and the appellee in that court brings the case here for further review, he may raise any question properly presented by the record to sustain the judgment of the trial court, even though those questions were not raised or argued in the Appellate Court." (*Mueller v. Elm Park Hotel Co.* (1945), 391 Ill. 391, 399.) Because the State was the appellee in the appellate court and that court reversed the trial court, the State can raise the issue of the sex-offense standard in this court, even though such an issue was not presented to the appellate court.

Turning to the appellate court order in the instant case, it is clear the court employed the sex-offense standard that the State now urges us to reject. The court reversed defendant's conviction after finding that "Dr. Ahart's testimony *** was not sufficient corroboration to sustain a conviction where the complainant's testimony was otherwise unconvincing."

We agree with the State that the sex-offense standard should no longer be utilized in reviewing the sufficiency of the evidence on appeal. At trial, a sex-offense victim's testimony is not subject to a special jury instruction. But see Illinois Pattern Jury Instructions, Criminal, No. 3.17 (2d ed. 1981) (IPI Criminal 2d) (which reads in part, "[w]hen a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution").

Under the current standard, the testimony of a victim of a sex crime is deemed insufficient to sustain a sex-offense conviction on appeal where such testimony is not clear and convincing or substantially corroborated. However, as our appellate court has noted, the testimony of no other crime victim has the added requirement that it be clear and convincing or substantially corroborated to sustain a conviction on appeal. (*Roy*, 201 Ill. App. 3d at 185; *Puhl*, 211 Ill. App. 3d at 467-68; *Westfield*, 207 Ill. App. 3d at 777; *Nicholl*, 210 Ill. App. 3d at 1012; *In re A.J.H.*, 210 Ill. App. 3d at 70-71; *McCarthy*, 213 Ill. App. 3d at 879-80; *Lemons*, 210 Ill. App. 3d at 38; *James*, 200 Ill. App. 3d at 394-95; *Meador*, 210 Ill. App. 3d at 831.) Even the uncorroborated testimony of an accomplice may be sufficient to support a conviction. (*People v. Jimerson* (1989), 127 Ill. 2d 12, 44.) We find it incongruous for an appellate court to view a sex-offense victim's testimony with skepticism by employing this special standard of review, when a fact finder has previously considered the testimony of the victim, together with any other evidence presented at trial, and found the defendant guilty beyond a reasonable doubt.

In place of this standard, we find that the reasonable doubt test articulated in *People v. Collins* (1985), 106 Ill. 2d 237, should govern an appellant's claim of evidentiary insufficiency in sex-offense cases. The reasonable doubt

test has taken the place of another specialized standard of review, the reasonable hypothesis of innocence test, a test which was formerly used in circumstantial evidence cases. In *People v. Pintos* (1989), 133 Ill. 2d 286, the court stated:

"[I]n *People v. Linscott* (1986), 114 Ill. 2d 340, this court tacitly rejected the reasonable hypothesis of innocence standard of review by utilizing the reasonable doubt test to affirm a conviction that had been based entirely on circumstantial evidence. [Citation.] This court's rejection of the reasonable hypothesis of innocence standard of review in circumstantial evidence cases was made explicit in *People v. Eyler* (1989), 133 Ill. 2d 173, 191-92. In light of our decisions in *Eyler* and *Linscott*, we agree with the State: the reasonable hypothesis of innocence standard of review is no longer viable in Illinois. Instead, we find that the reasonable doubt test as set forth in *People v. Collins* (1985), 106 Ill. 2d 237, 261, should be applied in reviewing the sufficiency of evidence in *all criminal cases*, whether the evidence is direct or circumstantial." (Emphasis added.) *Pintos*, 133 Ill. 2d at 291.

We find that where the evidence is claimed to be insufficient on review, regardless of the nature of the evidence, the reasonable doubt test set forth in *Collins* should be applied. According to *Collins*, 106 Ill. 2d at 261, criminal convictions are not to be overturned on review unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. The test to be employed on review " 'is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Collins*, 106 Ill. 2d at 261, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.

The elements of the crime of aggravated indecent liberties with a child were given to the jury in a modified

version of IPI Criminal 2d No. 9.09. The instruction provided, in pertinent part, as follows:

"To sustain the charge of aggravated indecent liberties, the State must prove the following propositions:

*First*: That the defendant performed an act of sexual intercourse with [complainant]; and

*Second*: That the defendant was then 17 years of age or older; and

*Third*: That [complainant] was then under the age of 9 years.

Sexual intercourse occurs when there is any penetration of the female sex organ by the male sex organ."

The critical evidence introduced by the State was the testimony of the complainant. Her testimony as to how the offense occurred was as follows:

"Q. Where were you?

A. I was in the living room.

Q. And can you tell us what happened?

A. He told me to take off my clothes and lay on the bed.

Q. Did you do that?

A. Yes.

Q. Now, do you remember how Art was dressed?

A. Tee shirt. That is about it.

Q. Did you lay on the bed?

A. Yes.

Q. And after you layed on the bed, what is the next thing that happened?

A. He told me to bend my knees.

Q. Did you?

A. Yes.

Q. And after you bent your knees, what is the next thing that happened?

A. He got on the bed and started to stick his penis in my vagina.

Q. You say he started. Did he actually put it into your vagina?

A. Halfway, yes."

Dr. Ahart, a pediatrician who estimated that she examined greater than two thousand child abuse cases, examined complainant and diagnosed her condition within a reasonable degree of medical certainty as child sexual abuse.

Citing *Morgan*, 69 Ill. 2d 200, defendant contends that the evidence is insufficient to support his conviction because he characterizes complainant's testimony as "palpably unbelievable." Defendant attacks complainant's credibility for the following reasons: Dr. Ahart testified that complainant exhibited certain psychotic features; while under oath, complainant falsely accused her uncle of putting his penis inside of her because she was angry with him; complainant had a similar motive to falsely accuse the defendant because she did not want him around her mother; a child welfare specialist testified that the complainant told her that she made up the allegation about the defendant because she was angry with him; complainant told certain police officers that her allegation against the defendant was not true; and complainant was a sexually aberrant child.

Defendant also directs this court's attention to the fact that complainant's testimony was replete with contradictions and inconsistencies, such as: she denied that she hit her brother with a flashlight, but she told a DCFS worker she did; she denied that she caused her brother to have sex with a girl, but she previously testified she did; she denied that she ever saw her uncle and aunt engage in sex, but she previously testified that she did; she denied that she ever accused a boy named Brian of sexual abuse, but she told a police officer that Brian put his finger into her vagina; and she stated that defendant abused her in the spring or summer, but she previously testified that it occurred in the fall.

In *Morgan*, a conviction for taking indecent liberties with a child was reversed because the court found the victim's "testimony was neither clear and convincing nor substantially corroborated, as required in cases of this nature." (*Morgan*, 69 Ill. 2d at 206.) However, with this opinion, a victim's testimony no longer needs to be clear and convincing or substantially corroborated for a defendant to be found guilty of a sex offense. The reasonable doubt standard set forth in *Collins* is now the standard of review to be applied in all criminal cases.

Essentially, defendant claims that complainant's testimony is unbelievable. However, the jury is charged with the responsibility of weighing the credibility of witnesses and resolving any conflicts and inconsistencies in their testimony (*People v. Eyler* (1989), 133 Ill. 2d 173, 191; *People v. Phillips* (1989), 127 Ill. 2d 499, 514; *People v. Sanchez* (1986), 115 Ill. 2d 238, 261; *Collins*, 106 Ill. 2d at 261-62), "and a court of review will not *normally* substitute its own judgment in that regard" (emphasis added) (*People v. Locascio* (1985), 106 Ill. 2d 529, 537). While we are mindful that a jury's determination of a defendant's guilt or innocence "is entitled to great deference, and when the sufficiency of the evidence is challenged we will not retry the defendant, \*\*\* it is [still] our duty to set aside a conviction when the evidence raises a reasonable doubt of defendant's guilt." (*People v. Boclair* (1989), 129 Ill. 2d 458, 474.) After reviewing the evidence in the light most favorable to the State, we find it to be so unsatisfactory that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt.

The key evidence offered by the State was the testimony of the victim. Not only does the record show that she admits to be a person who lies "a lot"; but, in addition, the record shows that she was impeached numerous times and her testimony was so fraught with inconsisten-

cies and contradictions that we find her testimony so lacking in credibility that a reasonable doubt of defendant's guilt remains. See, *e.g., People v. Stevenson* (1962), 25 Ill. 2d 361, 365 (testimony given by the complaining witness was "so unconvincing, conflicting and unreasonable that a reasonable doubt of the defendant's guilt must be said to exist").

On direct examination, she testified that her stepfather put his penis halfway inter her vagina. On cross-examination, she claimed that this incident occurred in the spring because no leaves were flying around, and yet, her juvenile court testimony was that it happened in the fall "[b]ecause all kinds of leaves were flying around." She testified that it happened only once, and yet, her juvenile court testimony was that it had happened "almost every day."

Moreover, she admitted that she lied to a judge when she falsely accused her uncle Mark of doing the very act of which defendant stands accused. She stated that she "was lying" because she was angry with her uncle. She also had a motive to falsely accuse the defendant because she wanted him to leave the house. Although she denied telling anyone that she was angry with the defendant, Nancy Carlton, a DCFS employee, testified that complainant told her that she made up the story about the defendant because "[s]he was angry at him for something." Chicago police detective Robert Collins testified that complainant told him "that she was mad at [the defendant] because he took one of her brothers to the carnival and didn't take her."

Although Dr. Ahart testified that that it is not uncommon for children to recant, three Chicago policemen, Terrence O'Neil, Gregory Bernacki and Robert Collins, and complainant's mother each testified that complainant recanted the allegation she had made against the defendant. Nancy Carlton testified that complainant told

her "[t]hat [the defendant] had not done it" and "that only Steve had done this."

While Dr. Ahart diagnosed complainant's condition as child sex abuse, a reasonable doubt exists as to whether the damage to her vaginal region was caused by the defendant. Complainant testified on cross-examination that when she first moved in to live with her mother, the defendant, and her two brothers, she "made [her brother William] suck on [her] private." She learned this from "[s]ome kids in Arlington Heights" and she said it "was called cherry lick." On cross-examination, complainant admitted that she had her brother put his penis inside of her. Although she denied she caused her brother to "put his private part in another little girl," her juvenile court testimony was that her brother "put his private in the little girl." Complainant told Officer Gregory Bernacki that "another boy that she only knew by the name of Brian had inserted his finger into her vagina." Moreover, she told Officer Robert Collins that "she was also molested by a man out in Arlington Heights and a young boy out in Arlington Heights while she was staying with her grandmother." She later told the police officer that the Arlington Heights incident was untrue. When asked on cross-examination whether she took off her clothes and showed her private parts to other people, she said that "[defendant] didn't teach me that. When I was doing that, I was in Arlington Heights, because when I left, that is the first time I ever saw [the defendant]." Complainant's mother testified that "[a]t least four or five times" she "caught [complainant] playing with herself," although complainant testified that she never played with her "private parts."

Complainant's testimony was contradicted in other respects too. She denied on cross-examination that she saw her uncle Mark and aunt Eva engage in sex. However, her juvenile court testimony was that she saw

Mark "put his private inside of her." Complainant denied that she hit her baby brother with a flashlight, but a DCFS employee testified that complainant told her "that she had picked up a flashlight that was on the baby's dressing table and that she had hit the baby in the head twice." The complainant was impeached to such a degree that we find that the evidence presented does not establish, beyond a reasonable doubt, that the defendant is guilty.

For the foregoing reasons, the judgment of the appellate court, reversing the trial court, is affirmed.

*Appellate court affirmed.*