2022 IL App (1st) 190021-U
No. 1-19-0021
Order filed September 19, 2022

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

|  |  |  |
|---|---|---|
| PEOPLE FOR THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 14 CR 10305 |
| EDWARD LOGAN, | ) ) | The Honorable Thomas J. Byrne, |
| Defendant-Appellant. | ) ) | Judge, Presiding. |

JUSTICE HYMAN delivered the judgment of the court.
Justices Walker and Coghlan concurred in the judgment.

**ORDER**

¶ 1   *Held*: We affirm Logan's conviction and sentence where the State proved him guilty beyond a reasonable doubt, the trial court's limitation on questioning a minor victim about the source of DNA on her underwear was not an abuse of discretion, the trial court did not err in finding no violation of Logan's right to a speedy trial, and counsel had a valid strategy in agreeing to continuances during the pendency of the State's petition to find Logan a Sexually Dangerous Person.

¶ 2   The trial court found Edward Logan guilty of criminal sexual assault after his girlfriend's minor daughter, D.C., accused him of forcing her to perform multiple sexual acts. Forensic analysis

of two pairs of D.C.'s underwear revealed multiple sources of male DNA. Logan could not be excluded from several of the DNA profiles. Though the probability of finding the tested samples in a random population of white males varied, the rarest occurring sample could be found in 1 out of every 72 unrelated white males. Given the relative weakness of the DNA evidence, the trial court concluded that the ultimate question was "whether or not the victim of [t]his charged offense is credible and believable." Finding D.C. credible, the court found Logan guilty and sentenced him to 17 years in prison.

¶ 3     Logan raises four arguments against his conviction: (i) the State failed to prove beyond a reasonable doubt that he was D.C.'s "family member," (ii) the trial court erred in preventing him from cross-examining D.C. on the illegal sexual encounters leading to the presence of other male DNA found on her underwear, (iii) trial counsel was ineffective for failing to act in a manner that protected Logan's statutory right to a speedy trial, and (iv) Logan was deprived of his constitutional right to a speedy trial.

¶ 4     We affirm. The State presented sufficient evidence in the form of D.C.'s testimony to establish Logan as a family member, and contrary evidence was for the finder of fact to resolve. We also conclude that the trial court struck the appropriate balance in admitting evidence tending to show another possible perpetrator (DNA on D.C.'s underwear) and excluding questioning of D.C. about the source of the DNA. Moreover, neither the trial court nor trial counsel prevented Logan from exercising his right to speedy trial. As to Logan's constitutional right, almost all the delay was attributable to him, through his counsel; as to counsel's effectiveness, counsel had a valid strategy for waiting to see whether the State would successfully petition to have Logan deemed a Sexually Dangerous Person before proceeding with his prosecution.

¶ 5                                    Background

¶ 6      The parties do not dispute most of the evidence against Logan, and, given the nature of the offenses, we describe them only to the extent necessary to understand our analysis.

¶ 7      The State charged Logan with multiple counts of criminal sexual assault for actions he committed against his girlfriend's daughter, D.C. At the time of the offense, D.C. explained, Logan had been living in the family home "for like a year." Logan and D.C.'s mom periodically fought, so Logan would occasionally sleep in his truck in the garage. At the time of the alleged assault, Logan had "left the house" and was "staying in the garage." But Logan had keys to the house, and D.C. was unaware that he had left for any substantial period. D.C.'s mother testified, however, that Logan had gone on a trip in September 2012 for the two months before the assault occurred in November 2012.

¶ 8      On November 19, Logan took D.C. to McDonald's before returning to the house and parking in the garage. The front seating area of Logan's truck, where he and D.C. sat, was a single bench seat with no center console separating him and D.C. Logan closed the garage door and parked in a way that did not allow D.C. to open the door on her side of the truck. While the two were in the truck, Logan asked D.C. if she wanted to see a friend her mom had forbidden her from seeing. She said yes, and Logan replied she would "have to do something for [him]."

¶ 9      At that point, according to D.C., "the vibe just got weird," and Logan started rubbing her back. Then he started "touching [her] vagina over [her] clothes." Eventually, Logan put his finger inside D.C.'s vagina, had her put both her mouth and hand on his penis, and then put his penis inside D.C.'s vagina. After D.C. told Logan to stop a second time—he had ignored her plea to stop the first time—he stopped and told her, "what happened in this truck stays in this truck." D.C.

eventually told her sister what happened, and after her sister relayed the information to D.C.'s mother, D.C. also told her mother what happened.

¶ 10    About two days after the incident, D.C. went to the hospital. She explained they did a "pap smear" and checked her for sexually transmitted infections. Eventually, police officers came to D.C.'s home and collected the clothes she had been wearing at the time of the assault. D.C. identified her clothes in court, including four pairs of underwear. One pair had been cut, which D.C. identified as the pair she had been wearing "on the date in question."

¶ 11    By way of stipulation, the parties entered evidence that a forensic examiner from the Illinois State Police would have testified that she identified semen on one of the pairs of underwear collected from D.C. Another ISP forensic expert testified that she was able to collect three DNA samples from stains on two pairs of D.C.'s underwear. Unfortunately, the samples could not be analyzed using traditional methods, so the analyst used the "Y-STR" method, which looks at markers on only the Y chromosome.

¶ 12    The first sample (identified as 1A1) contained several DNA samples suitable for comparison. Logan could not be excluded from any of them, but for one sample, the DNA in the sperm fractions could be found in 1 out of every 20 unrelated males; for the second sample, the DNA could be found in 1 out of every 72 unrelated males; and for the third sample, the DNA could be found in 1 out of every 2 unrelated males. In sample 1B1, the analyst found a non-sperm mixture of four male DNA samples from which Logan could not be excluded; the DNA would be found in 52% of unrelated African-American males, 78% of unrelated white males, and 80% of unrelated Hispanic males. For the sperm fraction of sample 1B1, the analyst found a mixture of DNA from three males, and Logan was affirmatively excluded. Finally, the non-sperm fraction of sample 1B2 included a mixture of DNA from six males from which Logan could not be excluded. This DNA

would be found in 98% of unrelated African-American males, 99% of unrelated white males, and 99% of unrelated Hispanic males. The sperm fraction of 1B2 continued a mixture of DNA of two males from which Logan could be affirmatively excluded. The mixed fraction of 1B2 included DNA from five males from which Logan could not be excluded but which could be found in 91% of unrelated African-American males, 85% of unrelated white males, and 91% of Hispanic males.

¶ 13    During Logan's case-in-chief, he discharged his counsel and represented himself. He recalled D.C. to the stand and, through her testimony, coupled with additional stipulations, demonstrated inconsistencies between D.C.'s testimony and some of the points in the narrative she gave when she reported the offense to others. Logan highlighted these inconsistencies in his closing argument, together with the inconclusiveness of the DNA evidence. The trial court, sitting as factfinder, found Logan guilty after concluding the case was about "whether or not the victim of his charged offense is credible and believable." The court found D.C. credible and Logan guilty.

¶ 14    Before trial began, the State moved *in limine* to preclude Logan from asking D.C. about any sexual contact she may have had before the alleged assault. The State cited 725 ILCS 5/115-7, known as the Rape Shield Statute, and argued that any questioning would be irrelevant to a consent defense because D.C. could not have consented. At a hearing on the State's motion, Logan's counsel responded that the DNA evidence on D.C.'s underwear was probative to identifying D.C.'s actual assaulter and that someone else could have committed the crime of which the State charged Logan. The trial court allowed the physical evidence of other DNA samples to be admitted but barred defense counsel from questioning D.C. about them.  But, the court admonished the State that if it recalled D.C. to rebut the DNA evidence, it would not prevent Logan's counsel from further cross-examining on the issue.

¶ 15    After the case had been pending for about three years, Logan's counsel answered ready for trial on May 9, 2017. The State answered not ready due to a missing witness. About two months later, on July 11, the State again answered not ready and told the court, "I would like to open up discussions about a possible plea negotiation. And if those efforts fail, I am prepared to file a motion for the Court to appoint qualified evaluators pursuant to the Sexually Dangerous Persons Act and a petition to declare the defendant a sexually dangerous person."

¶ 16    Plea negotiations did fail after Logan rejected the State's offer of 12 years on August 29, 2017. The State then filed a petition under the Sexually Dangerous Persons Act (SDPA). See 725 ILCS 205/0.01, *et seq.* Logan interrupted court proceedings and demanded a speedy trial on the criminal charge. Because counsel represented Logan, the court rejected his request and continued the case. Logan's trial counsel withdrew, citing unfamiliarity with SDP proceedings, and the court appointed SDP counsel.

¶ 17    On October 16, 2017, SDP counsel filed a written speedy trial demand on the underlying criminal charges to "preserve" the issue. Still, counsel continued the proceedings on his own motion or by agreement until January 22, 2018, when the State withdrew the SDP petition. The court then appointed SDP counsel to continue representing Logan in the criminal case, and counsel either requested or agreed to seven more months of continuances. Trial began July 14, 2018, and produced the evidence we described above. After finding Logan guilty, the trial court sentenced him to 17 years in prison.

¶ 18                                    Analysis

¶ 19    We start with Logan's challenge to the sufficiency of the evidence. He claims the State failed to prove beyond a reasonable doubt that he was D.C.'s family member as defined by statute. He argues the State was obligated and failed to prove he continuously shared a residence with D.C.

for six months before the assault. The State responds that it proved the family member element because the statute does not require uninterrupted residency to establish continuity. We do not reach the parties' dispute about the proper interpretation of the statute because we find, under our deferential standard of review, the evidence was sufficient to establish Logan's continuous residence at D.C.'s house even under his more restrictive reading of the statute.

¶ 20    When reviewing a defendant's challenge to the sufficiency of the evidence we ask whether, viewing all the evidence in a light most favorable to the prosecution, any rational finder of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Schott*, 145 Ill. 2d 188, 202-03 (1991). The factfinder makes credibility determinations and weighs inconsistencies in testimony. *Id.* at 206. We acknowledge some contradictions between D.C. and her mother about the continuity of Logan's presence in the house but viewing the evidence in a light most favorable to the State, we cannot say that "no rational trier of fact could have found [Logan] guilty beyond a reasonable doubt." See *id.* (restating standard).

¶ 21    To find Logan guilty of criminal sexual assault, the State had to prove that Logan was "a family member of the victim, and the victim [was] under 18 years of age." 720 ILCS 5/11-1.20(a)(3) (West 2016). The Article defines "family member" as, relevant here, "an accused who has resided in the household with the child continuously for at least 6 months." *Id.* § 5/11-0.1. The parties dispute the meaning of the word "continuously." Logan argues that D.C.'s mother's testimony that Logan left the house for a "couple months" before the assault defeats the State's proof of the "family member" element. The State responds that the statute does not require uninterrupted presence for us to find Logan's presence "continuous." We think D.C.'s testimony, which the trier of fact had before it, satisfies even Logan's more rigid test.

¶ 22　On this point, Logan claims there was "very little" testimony about the family member element amounting only to D.C.'s "vague statement" that Logan lived in her house for "like a year." Not so. D.C. also explained that Logan usually stayed in her mom's bedroom but would occasionally sleep in the garage if he and her mom had been fighting. D.C. also described Logan's role in their family dynamic, explaining he would enforce her mother's rules in her absence. On cross-examination, D.C. explained that if Logan ever left the house, "we didn't know" and that on the night of the assault, Logan had keys to the house because "it was his house." We acknowledge that D.C.'s mother testified that Logan left around September (about two months before the November assault), but at most, this created a conflict in the testimony for the trier of fact to resolve. *E.g., Schott*, 145 Ill. 2d at 206 (factfinder charged with "resolving any conflicts and inconsistencies" in witness testimony).

¶ 23　D.C.'s testimony, viewed in a light most favorable to the State, shows that Logan continuously resided in her household for at least six months. The trial court was not obligated to accept her mother's testimony over her own. The State proved Logan guilty beyond a reasonable doubt.

¶ 24　　　　　　　　　　　　　　　　*Rape Shield*

¶ 25　Logan argues the trial court erred in applying the Rape Shield Statute to bar "any questioning of D.C. herself" about the evidence showing she "was being sexually victimized by someone [else]." He claims the trial court misapplied Rape Shield in a way that violated his sixth amendment right to confront witnesses against him. The State responds that questions to D.C. about the identity of her assaulter were irrelevant to "whether [Logan] committed the charged offense" and inquiry "about her sexual history and any other sexual partners she may have had could only serve to harass and humiliate her." The record does not support the connection Logan

wants to draw between the evidence that other people were having illegal sexual contact with D.C. and his theory that this alleged contact meant she would lie about Logan assaulting her. We find the trial court properly exercised its discretion to prevent Logan from questioning D.C. about the identities of the contributors to the DNA in her underwear.

¶ 26    Under the Rape Shield Statute, evidence of "the prior sexual activity or the reputation of the alleged victim *** is inadmissible except (1) as evidence concerning the past sexual conduct of the alleged victim *** with the accused when this evidence is offered by the accused upon the issue of whether the alleged victim *** consented to the sexual conduct with respect to which the offense is alleged; or (2) when constitutionally required to be admitted." 725 ILCS 5/115-7(a) (West 2012). As the text implies, the Statute serves two primary purposes: (i) it protects the victim from harassment or humiliation based on "reputation for chastity or specific acts of sexual conduct with persons other than the defendant," and (ii) it prevents the admission of evidence irrelevant to the issue of whether the defendant committed the sexual assault on the date and time charged. *People v. Sandifer*, 2016 IL App (1st) 133397, ¶¶ 21-22. We review the trial court's application of the Rape Shield Statute and its purposes for an abuse of discretion. *Id.*, ¶ 26.

¶ 27    Because D.C. could not legally consent to sexual conduct, Logan relies on the constitutional exception to the Rape Shield Statute. To invoke the constitutional exception, the evidence of past sexual activity a defendant wants to admit must be directly relevant to disputed issues. *People v. Johnson*, 2020 IL App (1st) 162332, ¶ 73. In other words, the evidence must "make a meaningful contribution to the fact-finding enterprise." *Id.* The trial court remains within its discretion to refuse evidence that creates an undue risk of harassment, prejudice, or confusion. *Id.*, ¶ 74 (citing *People v. Bates*, 2018 IL App (4th) 160255, ¶ 64). For instance, if the proposed

evidence is duplicative or inconsistent with the defendant's trial theory, the trial court may exclude it. See *id.*, ¶ 76 (discussing and relying on *Bates*).

¶ 28    As Logan points out, our primary inquiry under the Rape Shield Statute involves relevance. *People v. Hill*, 289 Ill. App. 3d 859, 864 (1997). For example, the confrontation clause can require the admission of past sexual conduct (i) where it shows "bias, interest, or ulterior motive for making a false charge," (ii) where it can "explain physical facts in evidence such as semen," or (iii) where the victim "engaged in a prior pattern of behavior clearly similar to the conduct immediately at issue." *Id.* (discussing *People v. Sandoval*, 135 Ill. 2d159, 174-75, 185 (1990). But *Hill*, while it states the rule in terms favoring Logan, provides the exact analysis that ultimately defeats his claim.

¶ 29    In *Hill*, the defendant sought to admit previous instances of the minor victim's sexual conduct to explain how she might have known sexual terms beyond her years. *Id.* at 864-65. The court found the general category of questioning admissible in an appropriate case but an insufficient link between the age-inappropriate testimony and the victim's previous conduct. *Id.* at 865. The previous conduct involved a boy whose age and stage of maturation was unknown, meaning the victim could not have derived her sexual knowledge from him. *Id.* In other words, the previous conduct and the exception to Rape Shield (the victim's sexual knowledge) were not sufficiently connected. *Id.* The court, therefore, determined that the previous sexual incidents were "collateral to the inferences properly drawn from [the victim]'s sexual knowledge and nonprobative to the issue of defendant's guilt or innocence." *Id.*

¶ 30    We find the sexual incidents creating the DNA samples found on D.C.'s underwear similarly collateral to Logan's guilt or innocence. Nothing in the record draws a connection between the illegal sexual conduct D.C. experienced and her motive to implicate Logan

dishonestly. We recognize Logan's contention that he could not have drawn that connection without questioning D.C., an argument not without some force. But without evidence that cross-examining D.C. about the intimate details of previous incidents of sexual abuse or assault perpetrated against her would lead to the motive or bias evidence Logan sought, we cannot say the trial court abused its discretion in barring questioning of D.C. on the subject.

¶ 31     More importantly, the trial court exercised its discretion to strike what we consider a delicate balance between admitting physical evidence of previous sexual abuse or assault (DNA evidence) and barring unnecessarily probing questions about those incidents. For example, our precedents would have allowed the trial court to bar even the DNA evidence Logan introduced. See *People v. Johnson*, 2020 IL App (1st) 162332, ¶¶ 74-76 (discussing *People v. Bates*, 2018 IL App (4th) 160255)). Again, we acknowledge points of distinction between the DNA evidence in *Johnson* and the evidence against Logan. The victim in *Johnson* was an adult, capable of engaging in consensual sexual acts, excluding the DNA evidence, therefore, struck at the heart of Rape Shield's purpose of preventing undue embarrassment of the victim. *Id.*, ¶ 74. D.C., contrastingly, was legally incapable of consent in any sexual context, and so questioning her could not, by definition, be an attempt to embarrass her with a seemingly "promiscuous" sexual past. But, as our discussion reveals, the trial court was confronted with essential considerations on both sides, and our review of the record does not reveal an abuse of discretion in the balance the trial court struck.

¶ 32                              Ineffective Assistance of Counsel

¶ 33     Logan argues that his trial counsel was ineffective for failing to protect his right to a speedy trial. He claims the State initiating proceedings under the Sexually Dangerous Persons Act did not toll the speedy trial clock and counsel "plain[ly] misunderst[ood] the law" and forfeited his right to a speedy trial. The State responds that counsel could not have been ineffective because

proceedings under the SDPA do not toll the speedy trial clock. We agree that the State has the better reading of the statutory law, and insufficient evidence exists to show a violation of Logan's constitutional speedy trial protections. We do not, however, condone the State's eleventh-hour attempt to coerce a plea under threat of SDPA proceedings. The General Assembly should bring the SDPA in line with the Sexually Violent Persons Act, which protects a defendant's speedy trial rights even in a much less urgent context.

¶ 34    The familiar two-prong analysis from *Strickland v. Washington*, 466 U.S. 668 (1984) governs Logan's claim. See *People v. Utley*, 2019 IL App (1st) 152112, ¶ 36. To demonstrate ineffective assistance, Logan must show (i) his counsel's performance was deficient, and (ii) the deficient performance prejudiced him. *Id.* We review claims of ineffective assistance of counsel *de novo*. *Id.* ¶ 37.

¶ 35    A defendant's counsel cannot be ineffective for failing to pursue a meritless course of action, *e.g., People v. McIntosh*, 2020 IL App (5th) 170068, ¶ 54, so we turn to the merits of the speedy trial claim Logan argues counsel should have pursued in the trial court. Logan argues that we should consider the 36 days between his arrest and arraignment as part of the time accrued under the speedy trial statute. We do not quarrel with that proposition. At issue is Logan's claim that we should hold an additional 146 days against the State from the day Logan demanded trial on August 29, 2017, to the termination of the SDPA proceedings. The State argues we cannot count this time because proceedings under the SDPA toll the operation of the speedy trial statute.

¶ 36    Our task, then, is primarily one of statutory interpretation. We must give effect to the intent of the General Assembly by applying the statute's clear language and giving the words their ordinary meaning. *People v. Mims*, 225 Ill. App. 3d 488, 491 (1992). The Speedy Trial Act requires trial for a criminal offense to begin "within 120 days from the date [the defendant] was taken into

custody," and offers an enumerated list of six instances in which time is not counted toward those 120 days. 725 ILCS 5/103-5(a) (West 2014). Correctly pointing to the legislative silence about pending SDP petitions in the Speedy Trial Act, Logan argues we may not read exceptions into the Speedy Trial Act the legislature did not express. *E.g,. People v. Wells*, 294 Ill. App. 3d 405, 407 (1998).

¶ 37    On this point, the parties dispute the applicability of *People v. Spurlock*, 388 Ill. App. 3d 365 (2009). There, the Fifth District interpreted proceedings under the SDPA to "result in a stay of any further proceedings on the criminal complaint until a resolution of the issues raised in the sexually dangerous persons petition." *Id.* at 372. The court found the SDPA promotes "treatment and recovery in lieu of criminal prosecution" and that purpose could not be effectuated unless the underlying criminal proceedings were stayed. *Id.* at 375. Failing to suspend the speedy trial clock pending the disposition of an SDP petition would lead to two alternative results flouting the SDPA's purpose: (i) the expiring speedy trial term would force prosecution on the underlying criminal offense instead of continuing pursuit of treatment and rehabilitation, or (ii) the expiring speedy trial term would lead to dismissal of the criminal charges and a coordinated dismissal of the SDP petition. *Id.*

¶ 38    *Spurlock*'s statutory analysis is worthy of deeper discussion in an appropriate case, whether we agree with it or not. We think Logan's case is best understood, however, as dealing with one enumerated exception in the speedy trial statute: delay attributable to the defendant. 725 ILCS 5/103-5(a). The SDPA provides that the State file petitions claiming someone is sexually dangerous "in the same proceeding wherein such person stands charged with criminal offense." 725 ILCS 205/3 (West 2014).  Because counsel agreed to continuances during the pendency of the

SDP petition, the statute requires those agreed continuances be imputed onto the criminal case ("the same proceeding").

¶ 39    Logan argues, alternatively, that counsel could have no strategic reason for agreeing to continuances in the SDP proceedings after demanding trial in the underlying criminal proceedings on the immediately preceding court date. But we see counsel's strategy on the face of the record. Counsel admitted he was filing a speedy trial demand in the underlying criminal case as a matter of issue preservation. And, considering *Spurlock*'s discussion of the purposes of proceedings under the SDPA, we can imagine a valid trial strategy of allowing the State to pursue an avenue that ends in treatment and possible rehabilitation instead of criminal punishment.

¶ 40    Lastly, Logan argues that he was denied his constitutional right to a speedy trial, even if counsel was not ineffective in failing to protect his statutory right. There appears to be some confusion in the briefing as the State responds that trial counsel did not ineffectively fail to protect Logan's constitutional speedy trial right. But we read Logan's brief to raise a freestanding claim of a constitutional violation, not an additional ineffective assistance of counsel claim. Because both briefs analyze the merits of the constitutional speedy trial right, we will as well.

¶ 41    Both the United States and Illinois constitutions protect a defendant's right to a speedy trial. U.S. Const. amend. VI; Ill. Const. 1970, art. I, § 8 ("In all criminal prosecutions, the accused shall have the right *** to have a speedy public trial"). The constitutional right to a speedy trial has an "indistinct quality" and cannot be reduced to "an absolute or precise standard of time" by which a defendant must be tried. *People v. Crane*, 195 Ill. 2d 42, 47 (2001). To assist our determination, we examine "the record in its totality" to balance four factors: (i) the length of the delay, (ii) the reasons for the delay, (iii) the prejudice, if any, to the defendant, and (iv) the defendant's assertion of his right. *Id.* at 48 (citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972)). We

review constitutional speedy trial claims using a bifurcated standard of review where we defer to the trial court's factual findings unless they are against the manifest weight of the evidence, but we weigh the *Barker* factors *de novo. Id.* at 51-52.

¶ 42    We begin our consideration with the length of the delay because our inquiry is not even triggered "unless the complained-of delay crosses the threshold from ordinary to 'presumptively prejudicial.'" *Id.* Typically a "presumptively prejudicial" delay precipitating a *Barker* inquiry starts at about one year. *Id.* Logan's "complained-of" delay does not even arguably begin until he attempted to assert his speedy trial rights over the advice of counsel on August 29, 2017. We agree, however, that the delay caused by the SDP proceedings and the related need to substitute counsel multiple times approaches one year. So, we will continue to address the remaining factors.

¶ 43    Critical to our analysis is the nature of Logan's demand for a speedy trial. When a defendant fails to assert the right to a speedy trial, it becomes "difficult for a defendant to prove that he [or she] was denied a speedy trial." *Id.* at 58 (quoting *Barker*, 407 U.S. at 532). We are sympathetic to Logan's frustration at the sudden switch from criminal prosecution to SDP proceeding. And we can appreciate his uncounseled assertion of a demand for immediate trial on August 29. But he did not then move to discharge his lawyer, and in the speedy trial context, a defendant is bound "by the acts or omissions of his [or her] lawyer-agent." *People v. Bowman*, 138 Ill. 2d 131, 141-42. We also agree with the State that SDP counsel's filing of a speedy trial demand was an administrative action attempting to preserve the claim for review. Indeed, we fail to see how counsel could preserve the claim and then immediately waive the claim by agreeing to further continuances under his belief that SDP proceedings tolled the speedy trial clock. On balance, we view this factor neutrally—while Logan's demands were imperfect (and ultimately ineffective), he did not completely sit on his speedy trial rights in an attempt to trigger an unwarranted dismissal.

¶ 44    We turn next to the State's purpose in occasioning the delay, the factor that causes us greatest concern. The State has the burden to justify the delay, and "evidence that the State intentionally delayed prosecution to gain some tactical advantage will weigh very heavily against the State." *Id.* at 53. On July 11, 2017, the State answered not ready for trial after making a "substantial effort" to prepare. The State linked its desire to reopen plea negotiations with the filing of an SDP petition: "I would like to open up discussions about a possible plea negotiation. And if those efforts fail, I am prepared to file a motion for the Court to appoint qualified evaluators pursuant to the Sexually Dangerous Persons Act and a petition to declare the defendant a sexually dangerous person." On August 29, 2017, Logan rejected the State's offer, and the State filed its SDP petition.

¶ 45    The State's express link of its inability to proceed to trial and filing an SDP petition are concerning and, at least circumstantially, suggest an improper purpose. Without more evidence, however, we cannot determine whether the delay sought to gain a tactical advantage or included an inability to locate witnesses or the unavailability of those witnesses. See *id.* at 53-54 (unavailability of witnesses or inability to locate them are "valid explanations" for delay). We weigh this factor neutrally because Logan never made an effective demand or moved for dismissal in the trial court, the court never had the opportunity to have the State explain itself.

¶ 46    We then turn to Logan's assertion of prejudice. We agree that the State's last-minute shift to SDP proceedings prejudiced Logan. His original trial counsel felt compelled to withdraw, and he had new counsel for the SDP proceedings. Then, once the SDP proceedings were over, he had to wait again while new counsel in the criminal proceedings got up to speed. We also agree there is some evidence in the record of deterioration of D.C.'s and her mother's memories, particularly on the question of whether Logan was D.C.'s "family member."

¶ 47     Simply finding prejudice is not enough to find a constitutional violation. We are not permitted to separate the prejudice inquiry from our consideration of Logan's failure to adequately assert his right to a speedy trial. *Id.* at 61-62. As the court in *Crane* noted, we do not merely consider the *Barker* factors in the abstract; we must account for Logan's rights *and* the rights of public justice. *Id.* at 62. Because most of the delay was agreed, the delay Logan complains of was a small part of the total delay. The evidence of the State's improper purpose for causing the delay is inconclusive, we find dismissal "too severe a remedy *** in light of [Logan]'s inaction and the seriousness of the offenses involved." See *id.*

¶ 48     In sum, the State violated neither Logan's statutory nor constitutional right to a speedy trial because most of the continuances during the relevant period were agreed. His counsel was not ineffective for agreeing to those continuances as counsel had a valid strategy in attempting to divert the outcome of Logan's case to treatment instead of prosecution.

¶ 49     Affirmed.