2022 IL App (2d) 210556-U
No. 2-21-0556
Order filed September 27, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 15-CF-1333 |
| ORANE R. FOSTER, | ) ) ) | Honorable David Paul Kliment, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Presiding Justice Brennan and Justice Schostok concurred in the judgment.

**ORDER**

¶ 1   *Held*:  The evidence was sufficient to sustain both of defendant's convictions for aggravated criminal sexual abuse, and the convictions did not violate one-act, one-crime principles.  Affirmed.

¶ 2   After a jury trial, defendant, Orane R. Foster, was convicted of two counts of aggravated criminal sexual abuse (720 ILCS 5/12-16(c)(1)(i) (West 2014)) and sentenced to two concurrent three-year terms of imprisonment.  Defendant appeals, arguing that (1) the evidence was insufficient to sustain his convictions, and (2) alternatively, one of his convictions should be vacated under the one-act, one-crime doctrine.  We affirm.

¶ 3                                    I. BACKGROUND

¶ 4                            A. First Trial and Direct Appeal

¶ 5      In 2015, defendant was charged with five counts of predatory criminal sexual assault and two counts of aggravated criminal sexual abuse of victim, S.L., in that he touched her sex organ. After a jury trial, defendant was found guilty of four counts of predatory criminal sexual assault of a child under 13 years of age (720 ILCS 5/11-1.40(a)(1) (West 2014)) and two counts of aggravated criminal sexual abuse of a victim under 13 years of age (720 ILCS 5/11-1.60(c)(1)(i) (West 2014)).  The trial court sentenced defendant to six years' imprisonment on each of the four counts of predatory criminal sexual assault, to run consecutively, and three years' imprisonment on both counts of aggravated criminal sexual abuse, to run concurrently with each other but consecutively to the sentences imposed for predatory criminal sexual assault, for a total of 27 years' imprisonment.

¶ 6      On direct appeal, defendant: (1) challenged the sufficiency of the evidence on three of the four counts of predatory criminal sexual assault; (2) alleged, in the alternative, one-act, one-crime violations; and (3) alleged certain *voir dire* violations.  This court determined that the evidence was sufficient to sustain defendant's convictions for two counts of sexual penetration with a finger and two counts of sexual penetration with an object. *People v. Foster*, 2020 IL App (2d) 170683, ¶¶ 36-44.  Turning to the third issue, which we reviewed for prong-one plain error, we concluded that there was a *Zehr* violation (*People v. Zehr*, 103 Ill. 2d 472, 477-78 (1984)) and, because the evidence, though sufficient, was closely balanced, there was plain error. *Id.*  ¶¶ 60-63 (as S.L. did not "tell the same story that she earlier told the section 115-10 [(725 ILCS 5/115-10 (West 2016)] witnesses," whose testimony, along with defendant's, was consistent, the case was "a contest of credibility between the accounts of the section 115-10 witnesses and that of the defendant, and

credibility was the only basis on which this case could be decided.").  Accordingly, we reversed and remanded for a new trial and did not reach the one-act, one-crime issue.  *Id.* ¶¶ 63-65.

¶ 7                                      B. Second Trial

¶ 8                                   1. *Pretrial Rulings*

¶ 9      Certain pretrial rulings issued prior to the first trial remained in effect for the second trial. Specifically, the trial court had allowed the State to introduce, as substantive evidence under section 115-10 of the Code of Criminal Procedure of 1963 (Code) and provided S.L. testified at trial, S.L.'s prior statements made to Jazmin Lopez, Patricia (Patty) Sanchez, Celia Sanchez, and Pam Ely.  The court also granted the State's motion to admit medical hearsay, and Dr. Raymond Davis was also permitted to testify, pursuant to section 115-13 of the Code (725 ILCS 5/115-13 (West 2020)) about S.L.'s hearsay statements.

*¶ 10*                               2. *State's Case-in-Chief*

¶ 11     The second trial commenced on July 19, 2021.  The State's theory of the case was that, in August 2015, S.L., age six and while on a trip to Disney World with her father, Sergio L., and his girlfriend, Jazmin, disclosed that defendant had been touching her private parts.  Defendant, age 22, had moved into her mother's home in Aurora that summer.  When S.L. returned to Aurora with her father and Jazmin, they went to her grandmother, Celia's, home and S.L. told Celia and her aunt, Patty, that defendant had been touching her private parts.  Afterwards, family members contacted the police.  S.L. was subsequently interviewed by Ely at the Kane County Child Advocacy Center and told Ely that defendant came to her room at night and hurt her and she wanted him out of her home.  Dr. Davis examined S.L., and the exam was normal.

¶ 12                                  a. Sashonie (Sasha) M.

¶ 13    Sashonie (Sasha) M., S.L.'s mother, works as a customer-care specialist and had one child, S.L., who was born on February 3, 2009. She has lived in a two-bedroom apartment in Aurora for about seven years. Starting in June 2015, defendant temporarily moved into Sasha's apartment. He was to live in the apartment for about 60 days before returning to college. Sasha knew defendant because he was her then-best friend, Ashley Washington's, cousin. Defendant's father had "kicked" defendant out of his home.

¶ 14    Defendant lived in Sasha's apartment for 63 days, sleeping on a couch in the living room. S.L. slept in her own room at the time. Defendant worked in a factory during the day, and Sasha worked from 8 a.m. to 4:30 p.m. She had a babysitter for S.L.

¶ 15    While defendant lived with Sasha, Sasha would go to the Dollar Store across the street and leave S.L. with defendant. Sasha would be gone for no longer than 10 minutes. The Dollar Store shares a parking lot with Sasha's apartment. When Sasha went to the store, S.L. was in bed. During the summer, her bedtime was 8 or 9 p.m. The first time that Sasha went to the store that summer, S.L. was asleep but, when Sasha returned, S.L. was awake. She was not upset or crying when Sasha arrived home.

¶ 16    One day, when defendant first moved in in June, Sasha was in the kitchen, while defendant and S.L. were in the living room. S.L. was on a pillow close to defendant's lap. S.L. looked uncomfortable and scared. Sasha called S.L. to the kitchen because she had previously told S.L. not to sit on anybody's lap. In July 2015, Sasha was vacuuming her bedroom late one afternoon and S.L. ran inside the bedroom with a weird look that Sasha had never seen. She questioned S.L. about the look, but S.L. appeared to be in shock, did not say anything, and kept nodding her head. Defendant was inside the apartment at the time.

¶ 17    In the summer of 2015, S.L. went to Disney World with Sergio and Jazmin. Sergio did not live with Sasha but would visit with S.L.

¶ 18    On cross-examination, Sasha testified that, before the summer of 2015, she discussed many times with S.L. about good touches and bad touches. Defendant never volunteered to babysit S.L.

¶ 19    During the summer of 2015, Sasha dated Trinell. Trinell did not live with Sasha but sometimes spent the night in her bedroom.

¶ 20    Sasha never noticed scratches on S.L.'s legs or marks on her neck. S.L. did not complain about scratches or bruises. That summer, S.L. "possibly" had problems with urination, and Sasha took her to the doctor. However, S.L. had prior problems with urination.

¶ 21    On August 19, 2015, Sasha spoke with investigator Ely at the police department and told Ely that she believed Sergio and Jazmin fabricated the allegations against defendant and stated that there was no way that defendant could have touched S.L. because Sasha never left him alone with S.L. Sasha testified that she meant that she never left defendant alone with S.L. for extended periods.

¶ 22    DCFS placed S.L. with Patty. About one year later, S.L. was returned to Sasha. Prior to the Disney trip, Sasha had cut off Sergio and Jazmin from physically contacting S.L. but they were permitted to call S.L.

¶ 23    In 2015, S.L. never told Sasha that defendant hit her, choked her, touched her vagina with a pen, or touched her vagina with his fingers. Nor did S.L. tell Sasha that defendant tried to put his private part in her "booty" or threaten her.

¶ 24    Currently, DCFS is involved in a case with Sasha, specifically a domestic battery case where S.L. is the alleged victim.

¶ 25                                          b. S.L.

¶ 26    S.L., age 12 at the time of the second trial, testified that she was six years old in the summer of 2015. That summer, defendant lived in her apartment and slept on the living room couch. He worked and drove a red car. Sasha worked during the day, and she went outside, such as to the store, three times. S.L. was in the house with defendant. S.L. viewed defendant as an uncle.

¶ 27    When defendant lived with Sasha and S.L., S.L. had "touching problems" with him. He touched S.L.'s vagina with his pen or his fingers. The pen was S.L.'s bubble pen, with a pen at the bottom and bubbles on top. Defendant touched S.L.'s vagina with the pen more than two times during the night, in her bedroom. She felt scared and did not know what to do. After a while, it started to burn. Defendant also touched S.L.'s vagina with his fingers, "on the top" of her underwear or whatever else she was wearing. This occurred during the evening while she was in bed. S.L. wore a gown, pajamas, or shorts and a t-shirt. Defendant's fingers moved up and down. This occurred more than one time. S.L. was scared. Defendant threatened to kill her if she told Sasha. S.L. did not tell her mom. S.L. liked defendant but did not like what he was doing.

¶ 28    In 2017, S.L. saw defendant in court. She could not recall if she stated at that time that she did not know if defendant had a job.

¶ 29    In the summer of 2015, S.L. went to Disney World with Sergio and Jazmin. She could not recall if she showed Jazmin a scratch on her leg. S.L. could also not recall if she told Jazmin that defendant hurt her. However, the next day, S.L. told Sergio. S.L. acknowledged that she stated in a video that she first told Jazmin and that, in May 2017, she stated that she did not think she told Jazmin. Also, prior to the second trial, she told prosecutors that she did not tell Jazmin in Florida. She told her father first, and she told Jazmin later when they were in Illinois. She told other people about the touching problems with defendant, including Celia, Jazmin, Sergio, and Patty. In May 2017, S.L. stated that she only told Sergio.

¶ 30    Jazmin scratched S.L. on the leg with a pen cap. She did so intentionally because she was mad at S.L. S.L. could not recall telling Jazmin that defendant scratched her with his fingernail or telling Patty that the dog scratched her leg. S.L. told Jazmin that she did not tell Sasha what defendant had done because she did not want her mother to get in trouble.

¶ 31    S.L. had issues with defendant, including that he was messy, slept on the only good couch, and prevented her from watching television because he was on the couch.

¶ 32    S.L. could not recall if, after returning from Florida and dropping off Sergio at his friend's house, she told Jazmin in the car that defendant tried to put his private part in her booty. She did tell Jazmin that her pee burned but did not tell her that it hurt to pee because defendant put things in her booty. She told Jazmin that Sasha took her to the doctor, who gave her cream.

¶ 33    In Illinois, S.L. told Jazmin that defendant had choked her in the daytime in the bathroom while her mother was vacuuming. It hurt a little bit, and defendant told S.L. to have respect. S.L. did not tell Sasha about the choking incident; rather, she just ran into her mother's room and looked at her. S.L. told Sergio about the choking incident while they were in Florida.

¶ 34    While in the car alone with Jazmin, S.L. told Jazmin that she was asleep in Sasha's bed when she heard loud voices and went into the living room. She did not tell Jazmin that she saw defendant with two naked men. S.L. did not see two naked men but saw two girls who were clothed. Defendant took S.L. with him to drop off the two women, and then he brought her home.

¶ 35    S.L. did not tell Jazmin that defendant tried to tie her up or that he hit her. The only hitting incident with defendant was the choking incident during which he slapped her face. The slap hurt a little, and defendant did not hit that hard. S.L. did not tell Jazmin that defendant put "it" in her booty. She told prosecutors that defendant poked her in the "butt hole" and could not recall later saying she was not sure that it ever happened.

¶ 36    Defendant poked S.L.'s vagina with a bubble pen, and she told Jazmin this when S.L. made a group disclosure after returning to Illinois.  In 2017, S.L. stated that the bubble pen was used only for writing and blowing bubbles.  She testified at the second trial that this is what she used it for.  She could not recall if she stated at the first trial that it was not used another way.  Nor could S.L. recall denying that defendant touched her with the bubble pen.

¶ 37    S.L. recalled telling investigator Ely that defendant told her not to tell anyone and that he said it in a scary voice.  S.L. could not recall going to a doctor to discuss the touching problems with defendant, telling the doctor that defendant told her to not to tell anyone or else he would choke her, or telling the doctor that defendant tried to tie her arms with a belt while she was on the couch on her stomach.

¶ 38                                     c. Pamela Ely

¶ 39    On August 19, 2015, Ely, an investigator for the Kane County Child Advocacy Center, a division of the Kane County State's Attorney's office assigned to investigate child abuse, conducted a child forensic interview of S.L., which spanned about 30 minutes.  The interview was recorded and transcribed, and a video recording of the interview was played for the jury and transcripts were provided to the jury.  Ely also visited S.L.'s home and took photographs.  One photograph depicted a bubble pen in a drawer.

¶ 40    On cross-examination, Ely testified that S.L. never stated that defendant choked her with a belt, and she never mentioned that her anus was touched.  S.L. stated that she did not tell her mother what had occurred because she did not want defendant to get into trouble.  S.L. told Ely that defendant was lazy, did not clean, ate Chinese food all the time, used the only couch that worked, and watched television.

¶ 41    Ely spoke to Sasha, who told Ely that the alleged sexual abuse could not have occurred because she never left S.L. alone with defendant.  When S.L. referenced "bad spots" during the interview, she was seated and pointed downwards.

¶ 42    During the recorded interview, S.L. stated that she was six years old and that she lived with her mother and her uncle, Orane Foster.  She wanted defendant out of her house because he does "bad stuff" at night while S.L. is sleeping and when her mother is grocery shopping.  It hurts S.L.  S.L. never told her mother because she does not want to get defendant in trouble.  Defendant lived with Sasha and S.L. because his parents kicked him out.

¶ 43    Defendant hurt S.L. in "bad spots," meaning where she goes "potty."  S.L. called the part where she goes potty her vagina.  Defendant poked her with his finger outside her clothing.  However, sometimes defendant touched her on the skin where S.L. goes potty.  Defendant touched S.L. where she goes potty more than one time.  He always did it at night while S.L. was in bed.  S.L. discussed that her pee burned and that defendant only did it at night and, when it "burns a lot I wake up and he is just acting like [he] didn't do it and then he comes back" and does it.  Defendant also "trie[d] to do it with a pen."  He poked it where S.L. goes potty.  Defendant "poke[d]s it like really hard."  Defendant poked her with a black bubble pen twice.  Defendant would tell S.L. not to tell anyone and not to tell her mother.   He said it "really scary."

¶ 44    S.L. further stated that defendant worked during the day and had a red car.  He was mean to her mother because he never cleaned, only ate Chinese food, and lay on the only couch that worked.  S.L. told Jazmin, Patty, and Celia about defendant.

¶ 45                                    d. Jazmin Porras

¶ 46    Jazmin Porras testified that she dated Sergio in 2015.  During the Disney World trip that summer, Jazmin spoke with S.L. while they waited for a ride at the EPCOT theme park.  S.L. told

Jazmin that she hurt herself playing on the railings, but it did not hurt as much as this, at which point S.L. pointed to a scratch on her inner thigh. Jazmin asked what happened, and S.L. replied that defendant hurt her. She kept saying that she did not want to get her mother in trouble and that defendant hurts her.

¶ 47    The next morning, S.L. had a conversation with Sergio and then the three spoke together. S.L. told Sergio and Jazmin that defendant was mean to her and touched her in her vagina with his fingers. She also stated that Sasha was at the grocery store at night when it occurred.

¶ 48    After they returned to Illinois, while Jazmin drove S.L. to Celia's house, S.L. stated that it burned when she urinated and that Sasha had taken her to the doctor. S.L. then related that defendant put his private part in her booty and that it hurt. She appeared embarrassed. At Celia's house, Patty took S.L. inside and spoke to her. Afterwards, Patty came out crying and stated that she was going to call the police and DCFS.

¶ 49    At the time, Jazmin did not know defendant. S.L. related that defendant touched her while she slept and that, after she awoke, he would run to the kitchen. She also mentioned that defendant was mean to her, ate all her food, and once choked her. S.L. further stated that defendant put his fingers in her vagina.

¶ 50    On cross-examination, Jazmin testified that, prior to the Disney trip, S.L. was at her home a lot and Jazmin discussed with her good and bad touches. Later, Jazmin and Sergio became less friendly with Sasha, and they had not seen S.L. for about two months immediately prior to the trip because Sasha would not allow it.

¶ 51    Jazmin denied cutting S.L. or using a pen cap to cut her thigh. Jazmin previously wrote in a letter that S.L. stated that defendant hit her when she made loud noises and touched her when she was asleep.

¶ 52    During the drive to Celia's house, S.L. stated that she told Sasha that it hurt when she urinated because defendant "put it in her booty" and that Sasha took S.L. to the doctor, who gave her cream.  S.L. told Jazmin that Sasha said it hurt because S.L. did not wipe properly, and S.L. replied that it hurt because defendant "puts things in my booty."  Also on the drive to Celia's house, S.L. told Jazmin that she awoke one night and saw defendant and two men in the living room.  She could not recall if S.L. said that the men were naked or if she said that there were also two naked women there.  S.L. told Jazmin that she told the group that they were nasty.

¶ 53    S.L. never told Jazmin that defendant tried to tie her up and did not recall if S.L. told her that defendant poked her with a pen or threatened her.  Jazmin also could not recall if S.L. stated that defendant poked her vagina with a pen.  She also could not recall her testimony that S.L. never said anything about a pen.

¶ 54                              e. Patricia (Patty) Sanchez

¶ 55    Patty (S.L.'s paternal aunt) testified that, on August 18, 2015, she spoke to S.L. at Celia's house.  She asked S.L. to tell her what she told Sergio and Jazmin, and S.L. replied that defendant hurts her.  She would be in bed and would feel defendant start to touch her.  He used his fingers to touch her private part and would try to put his private part inside her private part.  S.L. pointed to her vagina and said that defendant did not touch her anywhere else.  She stated that this happened at night when her mother went to buy groceries.  Defendant covered her mouth so that she could not scream when he tried to put his private in her.

¶ 56    Patty could not recall if S.L. stated that defendant tried to put anything else in her besides his private and his fingers but did recall that  S.L. told her that defendant tried to put his private party in her booty and that it hurt a lot.  S.L. told Patty that defendant tried to choke her.  The scratch on her leg was from defendant's fingernail.

¶ 57    S.L. also said that she did not tell Sasha because defendant told her that he would keep hurting her and that he would hurt her mother, too.  Patty called DCFS.

¶ 58    On cross-examination, Patty conceded that, before she spoke to S.L., she was aware of what S.L. told Sergio and Jazmin.  S.L. never stated that defendant hit her.  She could not recall if S.L. said that defendant touched her with a pen, but she would have reported it had she been told that.  Patty loves S.L. like she is her daughter and took her to be interviewed by Ely.

¶ 59                                    f. Celia Sanchez

¶ 60    Celia (S.L.'s paternal grandmother) testified that she spoke with S.L. at her house after Patricia spoke with her.  S.L. asked Celia to go to her home and sit on her bed to find out what defendant had done to her.  S.L. did not describe what defendant did to her.

¶ 61                                    g. Dr. Raymond Davis

¶ 62    Dr. Raymond Davis, a pediatrician who is board certified in pediatrics and child abuse, testified as an expert in the field of sexual assault examinations and sexual abuse diagnosis.  On August 19, 2015, he examined S.L.  Dr. Davis was aware that it had been reported that S.L. was sexually abused that summer by defendant.

¶ 63    S.L. told Dr. Davis that defendant does bad things to her "potty" and that he pokes it a lot with his fingers or a pen or pencil.  She described her potty as where she pees from.  Defendant did these things at night when her mother was not home.  Sometimes, he did it while S.L. slept and, when she awoke, he said that he was not doing anything.  S.L. also told Dr. Davis that defendant touched and poked her "butt hole" with his hand at night.  She also said that defendant went into the bathroom one day and choked her and said she needed to learn respect.

¶ 64    S.L. also told Dr. Davis that defendant told her that, if she told anyone about the bathroom incident, he would choke and hurt her every day.  S.L. stated that she told Jazmin.  She reported

that defendant tried to tie her arms with a belt behind her back while she was on the couch on her stomach, but she moved her arms out of the way.

¶ 65    Dr. Davis opined that S.L.'s examination was normal for her genital and anal areas. However, a normal exam does not rule out the possibility of sexual abuse because injuries can heal over time and certain touching may not cause injury. A sexual assault kit was not administered because S.L. was last in defendant's presence over 1½ weeks earlier, and samples for such kits should be collected within 48 to 96 hours of the assault.

¶ 66    On cross-examination, Dr. Davis testified that S.L. had a history of painful urination but had no such symptoms at the time of her examination. He did not observe any bruising, scars, broken bones, cuts, or scabs. S.L. did not say anything about defendant touching her private part with his penis. Nor did she say that defendant hit her.

¶ 67                    3. *Defendant's Motion for a Directed Verdict*

¶ 68    The trial court granted defendant's motion for a directed verdict on two counts of predatory criminal sexual assault (finger in S.L.'s sex organ). The court denied the motion on the counts alleging predatory criminal sexual assault (object to S.L.'s sex organ) and aggravated criminal sexual abuse (touching of S.L.'s sex organ).

¶ 69                    4. *Defendant's Case-in-Chief*

¶ 70                    a. Shaunilia Foster, Eldon Foster, and Jason Gordon

¶ 71    Shaunilia Foster, a nurse, is defendant's cousin and has known him since he was eight years old. Defendant is from Jamaica. During the summer of 2015, Shaunilia was home from college and stayed at her mother's home in Aurora. Defendant's father also lived in Aurora. Defendant and his father did not have the best relationship, and defendant left and moved in with Sasha.

¶ 72    During that summer, Shaunilia's cousin, Yasmine Gordon, who is half-Filipino, was having a debutante ball, which is a Philippine cultural tradition. The family held practices all summer.

¶ 73    Eldon Foster, Shaunilia's father, testified that defendant is his brother's son. Eldon was aware that defendant had a full-time job. Defendant occasionally, *i.e.*, about three times per week, helped Eldon with his commercial plumbing business after defendant got off work.

¶ 74    Jason Gordon, defendant's uncle and Yasmine's father, testified that, during the summer of 2015, defendant was part of Yasmine's debutante council or her court. Participants needed to practice for a celebration dance. The practices ran five days per week from 6 to 10 or 11 p.m. Defendant was there every day. The ball was on July 17, 2015. Sometimes, defendant spent the night at their house.

¶ 75                              b. DCFS Investigator Melina Pantoja

¶ 76    DCFS investigator Melina Pantoja testified that she interviewed Jazmin on August 21, 2015. Jazmin stated that S.L. told her that, one night when her mother was out, she heard loud noises. She saw two naked guys and two girls. The guys asked her to go out with them, and she told them that they were nasty and went back to bed.

¶ 77                                    c. Defendant

¶ 78    Defendant was 22 years old in 2015. Prior to that summer, he attended Middle Georgia State University and was studying to become a pilot. He took off a semester from school because he did not have money and moved in with his father. After they had an altercation concerning defendant paying rent, defendant moved into Sasha's apartment. Defendant knew Sasha because she was best friends with his cousin, Washington. Defendant met Sasha in 2007 when he was 14 years old, shortly after moving to the United States from Jamaica.

¶ 79 Sasha's apartment had been converted from one bedroom to two bedrooms. Sasha, S.L., Trinell, and defendant lived at the apartment, and defendant slept on the one functional couch. While living there, defendant worked at a Batavia factory five days per week, from 6 a.m. to 2:30 p.m., plus overtime. After work, he typically returned to the apartment to take a nap and then went to the gym or helped his uncle Eldon. Defendant also practiced five days per week for the debutante ball. On weekends, he spent time with Washington and Shaunilia, played soccer, or partied in Chicago.

¶ 80 Defendant never had an issue with either Sasha or S.L. He was not around S.L. often. Defendant did not do activities or watch television with S.L. He never screamed, hit, or threatened S.L. He never tried to wrap a belt around her or touch her vagina with his finger or poke her with a pen. Defendant testified that he never touched or attempted to touch any of S.L.'s body parts.

¶ 81 On cross-examination, defendant testified that he recalled being alone with S.L. one time. He babysat S.L. for eight hours one day, during the day, while Sasha worked. He helped her with math and reading the Bible, and he watched S.L. play outside with other kids.

¶ 82 On August 16, 2015, defendant moved out of the apartment and went back to school.

*¶ 83*                    5. *Stipulation and Exhibits*

¶ 84 The parties stipulated that, on September 9, 2016, prosecutors spoke with S.L. Initially, S.L. stated that defendant poked her butt hole, but, later, she said that she was not certain.

¶ 85 A partial transcript of S.L.'s trial testimony from May 9, 2017, was admitted into evidence. In the transcript, S.L. testified that the bubble pen was never used for any purpose other than for writing and blowing bubbles. When asked whether defendant ever touched her with the pen, S.L. responded, "No, I don't think so."

*¶ 86*                    6. *Verdict and Subsequent Proceedings*

¶ 87    On July 21, 2021, the jury found defendant guilty of two counts of aggravated criminal sexual abuse (touching of S.L.'s sex organ) and not guilty of two counts of predatory criminal sexual assault (object to S.L.'s sex organ).

¶ 88    On September 22, 2021, the trial court denied defendant's motion for a new trial. During the sentencing hearing, defendant stated in allocution that he was innocent of the charges. The court sentenced defendant to two concurrent terms of three years' imprisonment with each at 50% with good behavior. On April 29, 2022, defendant was released from custody after having served more than six years in prison. He appeals.

¶ 89                                II. ANALYSIS

¶ 90                        A. Sufficiency of the Evidence

¶ 91    Defendant argues first that the evidence was insufficient to sustain his convictions. He contends that S.L.'s multiple contradictory versions of purported improper touching by him were incredible, as was the "preposterous" theory that he committed the abuse in 10-minute timeframes while Sasha went to a nearby store. For the following reasons, we reject defendant's argument.

¶ 92    In reviewing the sufficiency of the evidence to sustain a conviction, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *People v. Thomas*, 178 Ill. 2d 215, 231-32 (1997). The trier of fact must "resolve conflicts in the testimony, *** weigh the evidence, and *** draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. We will not substitute our judgment for that of the trier of fact on the weight to be given the evidence or the credibility of the witnesses. *Thomas*, 178 Ill. 2d at 232. The testimony of a single witness, if

positive and credible, is sufficient to convict, even if it is contradicted by the defendant. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009).

¶ 93    "A person commits aggravated criminal sexual abuse if" he or she "is 17 years of age or over" and "commits an act of sexual conduct with a victim who is under 13 years of age[.]" 720 ILCS 5/11-1.60(c)(1)(i) (West 2020).  Sexual conduct is defined as "any knowing touching or fondling by the victim or the accused, either directly or through clothing, of the sex organs, anus, or breast of the victim or the accused, or any part of the body of a child under 13 years of age *** for the purpose of sexual gratification or arousal of the victim or the accused." 720 ILCS 5/11-0.1 (West 2020).

¶ 94    Defendant contends that the evidence against him was weak and contradictory and, thus, insufficient to sustain his convictions.  First, he argues that the limited timeframes during which he was alone with S.L. did not provide him the opportunity to commit the accused acts.  It is unlikely, he argues, that he abused S.L. when, according to S.L., he was left alone with her about three times while Sasha went to the store.  Defendant maintains that molesting a child within 10 minutes under the circumstances in this case is improbable and contrary to human experience.  A child molester, he suggests, would have sought opportunities to groom and be alone with S.L. for substantial periods.  He did not babysit S.L., he notes, and, although he on one occasion watched S.L. all day, there is no allegation that he molested her that day.  He also notes that Sasha told Ely that she believed Sergio and Jazmin made up the allegations against him and that Sasha reasoned that there was no way that defendant could have touched S.L. because she never left him alone with S.L.  Defendant further argues that S.L.'s appearance and conduct were not consistent with her allegations.  Sasha testified that S.L. was not upset or crying when Sasha arrived home from

her grocery trips and S.L. was never scared when Sasha left for the store. Nor did S.L. tell Sasha that defendant did anything inappropriate with her.

¶ 95 Defendant also argues that there was no evidence supporting S.L.'s allegations. The State, he contends, presented no evidence to substantiate her claims, nobody heard screams or cries for help, Dr. Davis's examination was "normal," no DNA evidence linked defendant to any sexual assault of S.L., and the evidence showed that defendant spent a lot of time away from Sasha's apartment while working or spending time with family and friends.

¶ 96 Further, defendant contends that S.L. had the knowledge and reason to falsely implicate defendant because she did not like him living in the apartment, she claimed he was messy, slept on the good couch, and prevented her from watching television. S.L. also had knowledge about bad touch, where Sasha had discussed it with her many times and where Jazmin had also discussed it with her. Also, the allegations arose during a trip with Sergio and Jazmin, whom Sasha had cut off from physical contact with S.L.

¶ 97 Next, defendant argues that S.L.'s testimony was contradictory. Specifically, she gave differing versions of purported abuse with a bubble pen, including that defendant twice touched her vagina with it in her bedroom at night, poked her vagina not with a bubble pen but with a pencil, and testified at the first trial that the pen was never used for any purpose other than writing and blowing bubbles. Defendant also notes that S.L. gave contradictory stories about what parts of her body were touched and how they were touched, including testifying on direct examination that defendant touched her vagina with his fingers and a bubble pen, telling Ely that defendant never touched her with anything but his fingers and the pen, and only touched her vagina, stating (per Jazmin) that defendant put his private part in her booty and that it hurt, and testifying on cross-examination that she told prosecutors that defendant poked her in the butt hole. S.L., defendant

notes, also stated (per Patty) that defendant tried to put his private part in her booty and that it hurt and told Dr. Davis that defendant touched and poked her butt hole with his hand at night. Defendant also contends that S.L. made contradictory statements that defendant tried to put his penis inside her vagina, specifically, she allegedly told Patricia that defendant tried to put his private part inside her private part and that he covered her mouth so she could not scream when he tried to put his private part in her. However, S.L. did not say anything to Dr. Davis about defendant touching her private part with his penis.

¶ 98    Defendant also notes that S.L. gave conflicting statements about the scratch on her leg, where she testified at trial that Jazmin intentionally scratched her with a pen cap because she was mad at S.L. and where she could not recall telling Jazmin while waiting in line at Disney World that defendant scratched her leg with his fingernail. Jazmin denied scratching S.L.'s leg and stated that S.L. claimed that defendant scratched her. Patty also testified that S.L. stated that defendant's fingernail caused the scratch. Further, defendant points to S.L.'s statements that she did not tell Sasha about the alleged abuse because defendant threatened to kill her if she told and that she did not tell her because she did not want to get defendant into trouble. Finally, defendant points to S.L.'s assertions concerning her hands being tied with a belt and about seeing two men in her living room one night. Defendant contends that these stories are bizarre, contradictory, and undermine S.L.'s credibility. The only consistency, he asserts, between S.L.'s testimony and her prior statements is that the alleged improper touching occurred at night when Sasha was at the store. This testimony, defendant urges, must be reviewed in light of all of the evidence. Given the problems with S.L.'s credibility, he argues, this court should reverse the convictions.

¶ 99    We conclude that the evidence was sufficient to sustain defendant's convictions. A reasonable jury could have found that defendant had the opportunity to commit the crimes in the

timeframes during which he was alone with S.L. The 10-minute periods during which Sasha testified she spent going to purchase groceries at the Dollar Store could have been found sufficient for defendant to touch S.L.'s vagina, as charged. We reject defendant's assertion that the 10-minute periods allowed for no grooming, for example. Defendant lived with S.L. for an entire summer, and, therefore, had the opportunity to establish a familiarity, rapport, and trust with the child. We also reject defendant's assertion that, because she was not upset or crying when Sasha returned home from the Dollar Store, was not scared when Sasha left for the store, and did not report any inappropriate actions by defendant, S.L.'s appearance and conduct were not consistent with her allegations. Sasha related two incidents at the apartment, while defendant was present, during which S.L. appeared scared. The first incident occurred while Sasha was in the kitchen after defendant had first moved in that June. Defendant and S.L. were in the living room, and S.L. was on a pillow close to defendant's lap. Sasha testified that S.L. looked uncomfortable and scared, and Sasha called her into the kitchen because she had previously told her not to sit on anyone's lap. The second incident occurred in July 2015, while Sasha vacuumed her bedroom late one afternoon. S.L., according to Sasha, ran into the bedroom with a weird look on her face that Sasha had not previously observed. When she questioned S.L., S.L. appeared to be in shock, did not speak, and merely nodded her head. The second incident is consistent with S.L.'s testimony that defendant choked her once in the bathroom while Sasha was vacuuming. He told her to have respect. S.L. testified that she did not tell her mother about the incident but just ran into her mother's room and looked at her. Dr. Davis also testified that S.L. related to him the choking incident.

¶ 100 S.L.'s testimony concerning the acts that formed the basis of the aggravated-criminal-sexual-abuse convictions was consistent. She told investigator Ely during the 2015 interview that

defendant did "bad stuff" at night while S.L. was sleeping and while Sasha was grocery shopping. She reported to Ely that defendant touched her vagina with his finger. She never told Sasha because she did not want to get defendant in trouble. Jazmin testified that, while in Florida, S.L. stated that, when Sasha was at the grocery store, defendant touched her vagina with his fingers while S.L. slept. Patty testified that S.L. told her on August 18, 2015, that, while she was in bed, defendant touched her vagina while her mother went to buy groceries. Dr. Davis similarly testified that, during his August 19, 2015, examination, S.L. reported that defendant poked her potty, which she explained was where her pee comes from, a lot with his fingers and that he did so when her mother was not home and while S.L. slept.

¶ 101    The alleged inconsistencies in S.L.'s testimony are not like the evidentiary problems identified in *People v. Schott*, 145 Ill. 2d 188 (1991), a case upon which defendant relies. In *Schott*, the supreme court affirmed the appellate court's reversal of the defendant's conviction for indecent liberties with a child. *Id.* at 206-09. The complainant had admitted to being a person who lied "a lot," she was impeached numerous times, and gave testimony "so fraught with inconsistencies and contradictions that we find her testimony lacking in credibility that a reasonable doubt of [the] defendant's guilt remains." *Id.* at 206-07. The complainant had claimed an incident had occurred at two different times of the year; she had lied to a judge when she falsely accused her uncle of the acts of which the defendant was accused and admitted she lied because she was angry with her uncle and wanted him to leave her house; she admitted to a DCFS employee that she had made up the story about the defendant because she was angry at him; she had recanted to three police officers; and the complainant's mother testified that the complainant had recanted her allegations against the defendant. *Id.* at 207.

¶ 102   Here, in contrast, there were only a few minor discrepancies in S.L.'s testimony, which the jury discounted.  For example, S.L. testified at the second trial that, in addition to touching her vagina with his fingers, defendant also touched her with a bubble pen.  However, the partial transcript of the first trial that was admitted into evidence during the second trial reflected that she testified that defendant did not touch her with a pen.  Ely testified that S.L. reported the touching with the pen during her interview in 2015.  S.L., during the second trial, could not recall denying that defendant touched her with the pen.  Jazmin could not recall if S.L. told her that defendant poked her with a pen and could not recall her prior testimony that S.L. never said anything about a pen.  Critically, the jury found defendant not guilty of the counts relating to the pen.

¶ 103   S.L. also testified: (1) that Jazmin scratched her leg (Patty testified that S.L. told her that defendant scratched her); (2) that she did not tell Jazmin that defendant tried to put his private part in her booty (Ely testified that S.L. never mentioned that her anus was touched; however, Jazmin and Patty testified that S.L. told them that defendant put his private part in her booty and that it hurt; Dr. Davis testified that S.L. told him that defendant poked her butt hole with his hand at night); (3) that she did not tell Jazmin that defendant tried to tie her up (though S.L. reported this to Dr. Davis); and (4) inconsistently about a story concerning either two naked men or two girls in the living room of the apartment one evening (Jazmin testified that S.L. told her that two men and two naked women were in the apartment one night and she told the group that they were nasty; DCFS investigator Pantoja testified that Jazmin related this story to her and it involved two naked men and two girls).  Admittedly, this testimony was not consistent or was perhaps improbable, but, again, the jury discounted it and found that S.L.'s key testimony concerning the acts for which defendant was convicted (*i.e.*, that defendant touched her vagina with his fingers more than once) was credible.  As we noted above, the key testimony was consistent.  The testimony about the

scratch, the anal touching, the tying up, and the nighttime visitors could reasonably reflect the imagination of a six-year-old or the possible manipulation of the child by her estranged parents/caregivers. Given that S.L.'s key testimony was consistent, we cannot find any basis to disturb the jury's credibility determination.

¶ 104   In summary, the evidence was sufficient to sustain defendant's convictions for aggravated criminal sexual abuse.

¶ 105                                  B. One-Act, One-Crime

¶ 106   Next, defendant argues alternatively that, if this court rejects his sufficiency argument, we must vacate one of his aggravated-criminal-sexual-abuse convictions because the trial court's failure to merge his duplicative convictions violated one-act, one-crime principles. For the following reasons, we reject defendant's argument.

¶ 107   Preliminarily, defendant concedes that he did not raise this issue in the trial court and that, thus, it is forfeited. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). However, plain errors affecting substantial rights may be reviewed on appeal. Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). An alleged one-act, one-crime violation is reviewable under the second prong of the plain-error doctrine because it affects the integrity of the judicial process. *People v. Coats*, 2018 IL 121926, ¶ 10. Although the one-act, one-crime rule is not of constitutional dimension, its purpose is to prevent the prejudicial effect that could result in those instances where more than one offense is carved from the same physical act. See *People v. Artis*, 232 Ill. 2d 156, 164-68 (2009). Under plain-error review, we first determine whether any error occurred. *People v. Herron*, 215 Ill. 2d 167, 187 (2005).

¶ 108   The one-act, one-crime rule doctrine bars convictions for multiple offenses that are based on the same physical act. *People v. Coats*, 2018 IL 121926, ¶ 11. In this context, "act" means

"any overt or outward manifestation which will support a different offense." *People v. King*, 66 Ill. 2d 551, 566 (1977). We first determine whether a defendant's conduct consisted of a single physical act or separate acts. *Coats*, 2018 IL 121926, ¶ 12. Multiple convictions are improper if they are based on precisely the same physical act. If, however, the defendant's conduct is based on more than one physical act, we proceed to the second step, determining whether any of the offenses are lesser-included offenses. *Id.* If not, then multiple convictions are proper. *Id.* Whether a violation of the rule has occurred is a question of law we review *de novo*. *Id.*

¶ 109 Defendant argues that the State never indicated that it intended to prove separate acts to support multiple convictions for aggravated criminal sexual abuse. He notes that counts VI and VII of the indictment are identical.[1] He also contends that the jury instructions and verdict forms did not distinguish count VI from count VII. If the jury, defendant asserts, had found that the evidence supported only one act of sexual conduct based on the jury instructions, it would still have convicted him of both counts because it was never informed that the verdicts required findings of more than one act. He relies on two cases.

¶ 110 First, defendant points to *People v. Strawbridge*, 404 Ill. App. 3d 460 (2010). In *Strawbridge*, the defendant was charged with predatory criminal sexual assault for placing his penis in the victim's vagina. The victim had testified that the conduct occurred on March 17, 2000,

---

[1]Both counts alleged that, on or about June 1, 2015, through August 18, 2015, defendant, age 17 or over, committed aggravated criminal sexual abuse, in that he "knowingly committed an act of sexual conduct with S.L. who was under 13 years of age when the act was committed, in that the defendant touched the sex organ of S.L. for the purpose of sexual gratification or arousal of the victim or the accused."

which was within the period described in both counts. Count I of the indictment alleged that such conduct occurred between June 24, 1999, and March 20, 2000, whereas count II alleged that the conduct occurred on or about March 20, 2000. This court vacated one of the defendant's convictions, holding that the multiple convictions violated one-act, one-crime principles because it was not possible to determine whether the jury found one instance of the charged conduct (and yet found him guilty with regard to both counts because that instance of conduct took place between the count I period but also happened to occur on or about the count II period), or multiple instances. *Id.* at 463.

¶ 111    In *People v. Crespo*, 203 Ill. 2d 335 (2001), upon which defendant also relies, the defendant had stabbed the victim three times "in rapid succession," and argued on review that his aggravated-battery conviction should be vacated because the charge stemmed from the same physical act that formed the basis of an armed violence charge. The supreme court held that, although each of the stab wounds could support a separate offense, the convictions for both aggravated battery and armed violence violated the one-act, one-crime doctrine, because the State had failed to apportion/differentiate the stab wounds among multiple charges in the indictment and, during closing arguments, the prosecutor had portrayed the defendant's conduct as a single attack. *Id.* at 342-44 ("the State specifically argued to the jury that the three stab wounds constituted great bodily harm," and it never argued that only one stab wound would be sufficient to sustain the charge). The court clarified that, for example, "a separate blow of a mop handle could support a separate conviction," but, in cases such as the one before it, "the indictment must indicate that the State intended to treat the conduct of [the] defendant as multiple acts in order for multiple convictions to be sustained." *Id.* at 345.

¶ 112  We find *Strawbridge* and *Crespo* distinguishable.  *Strawbridge* involved separate overlapping periods and, therefore, it was not possible to determine the jury's precise findings.  In contrast, there are no separate overlapping periods in this case.  *Crespo* is distinguishable because the State presented the conduct as a single incident, whereas, here, the State noted during closing argument S.L.'s testimony that defendant touched her vagina "more than one time."  The prosecutor also noted S.L.'s testimony concerning how defendant's hands moved, noting that she explained that they moved up and down and that "it would be over her underwear, except for when she was wearing a gown.  Then it was under her underwear and on top."  Also, unlike *Crespo*, the acts to which S.L. testified occurred over a period, not within moments of each other.

¶ 113  We find *In re G.A.T.*, 2017 IL App (3d) 160702, which defendant does not address, instructive.  In *G.A.T.*, the respondent forced the victim to place his mouth on the respondent's penis in a shed and twice in a bedroom.  The respondent was charged with aggravated criminal sexual abuse, sexual exploitation of a child, and battery.  The reviewing court rejected the respondent's argument that the State had failed to apportion each singular occasion to a specific count, concluding that there were "three separate crimes on three separate occasions" and that "it was not necessary to commit one in order to commit another."  *Id.* ¶¶ 32-34.  The court distinguished *Crespo*, noting that the State in the case before it had charged the respondent with three separate counts based on the incidents, argued during closing argument that they occurred "on three separate occasions," and, in contrast, the stabbings in *Crespo* had all occurred within a matter of minutes, not over a period, "which more readily availed themselves of supporting separate adjudications."  *Id.* ¶¶ 33-34.

¶ 114   Here, S.L. stated both during Ely's interview and during her trial testimony that defendant touched her more than one time.  The State, as noted, reiterated during closing arguments that S.L.

testified as such. The jury, therefore, was informed that the State treated defendant's conduct as separate acts, S.L.'s testimony supported a finding of multiple acts, and defendant was on notice that the State sought to have him twice convicted of aggravated criminal sexual abuse.

¶ 115 In summary, defendant's conducts consisted of separate acts and none of the offenses are lesser-included offenses (because they are identical offenses). Thus, there was no one-act, one-crime violation, and we honor the procedural default.

¶ 116                                   III. CONCLUSION

¶ 117 For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 118 Affirmed.