2022 IL App (2d) 210328-U
No. 2-21-0328
Order filed November 10, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Kane County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18-CF-1499 |
| | ) | |
| JOSE BARON, a/k/a Jose Barron, | ) ) | Honorable Alice C. Tracy, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE BRENNAN delivered the judgment of the court.
Justices McLaren and Jorgensen concurred in the judgment.

**ORDER**

¶ 1   *Held*: Sufficient evidence supported defendant's convictions of various sex offenses against his niece. Although the victim described defendant abusing her in situations where there was a risk of discovery by third persons, we will not disturb the trial court's findings that the victim's accounts were credible and defendant's denials were not credible.

¶ 2   After a bench trial, defendant, Jose Baron, a/k/a Jose Barron, was convicted of three counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(3) (West 2016)) and one count of aggravated criminal sexual abuse (*id.* § 11-1.60(b)) and sentenced to a total of 15 years in prison. On appeal,

he contends that he was not proven guilty beyond a reasonable doubt of any of these offenses. We affirm.

¶ 3                                              I. BACKGROUND

¶ 4      The State charged defendant with by indictment nine offenses, all allegedly committed between October 12, 2015, and March 22, 2018, against his niece, Y.M., who was then under 18 years old. Specifically,

   a)  counts I and II alleged that defendant committed separate acts of criminal sexual assault by placing his mouth on the sex organ of Y.M.

   b)  count III alleged that he committed criminal sexual assault by placing his fingers into the sex organ of Y.M.

   c)  count IV alleged that he committed aggravated criminal sexual abuse by placing his fingers on the sex organ of Y.M.

   d)  counts V and VI alleged that he committed separate acts of criminal sexual assault by placing his sex organ into the mouth of Y.M.

   e)  counts VII, VII, and IX alleged that he committed separate acts of criminal sexual assault by touching the breast of Y.M.

All counts alleged that defendant committed the acts for his sexual arousal or gratification.

¶ 5      Defendant's trial began January 4, 2020. We recount the trial evidence. Y.M. testified on direct examination as follows. She was 18 years old and had resided on Southfield Avenue in Aurora for three years with her mother, Elia M., her stepfather, Gustavo Echeverria, and her sister, Y.S. Previously, her family had resided on Winterfield Drive in Aurora.

¶ 6      In March 2018, Y.M. spoke with her mother and sister. They then went to the Aurora police station and the Kane County Child Advocacy Center (Child Advocacy Center) in Geneva.

At that time, defendant resided on Benton Street in Aurora with his wife, Maria, his stepdaughters, Perla and Gabriella, and his son Jonathan. Maria was Elia's sister.

¶ 7    Every weekend in 2015, Y.M. and Y.S. stayed over at defendant's house on Second Avenue in Aurora because Elia worked late. She also went there on weekdays to be with her cousins and on other occasions. At times, Y.M. would get out of school and take a short walk to defendant's house, which was across from her house. Asked whether she was ever there when the only other person present was defendant, Y.M. could not recall any such occasion. At times, however, other people were in the house, but she and defendant were alone in a room.

¶ 8    Y.M. further testified that the police were contacted because defendant had been molesting Y.M. since she was 12 years old. The first time was when she and Y.S. stayed overnight and slept on a couch in defendant's living room. At one point, Y.M. woke up and felt something on her vagina. She looked and saw defendant's mouth on the outside of her vagina. Y.S. was still asleep, and no one else was around. Y.M. noticed that her jeans and underwear had been pulled down to her ankles. Defendant told her to be quiet and go back to sleep, and he left.

¶ 9    The second incident occurred when Y.M. was 12 or 13 years old. She, family members, and numerous relatives were attending a barbecue at her Uncle Luis's house on Benton Street in Aurora. Y.M. was on or near the front porch. Nobody else was on the front porch then. Defendant came up to Y.M. and pulled her aside. He then led her to behind one of the vehicles parked in the driveway to the right of the house. Though she knew there were people sitting at tables set up in the backyard, she could not see anyone else from the area where he led her. Defendant told her to be quiet and kissed her on the mouth. Next, he rubbed her pants over her vagina. After a few minutes, Y.M. heard her sister calling, and she ran off. Defendant told her to go back and not tell anyone.

¶ 10    The third incident occurred shortly before Halloween, probably when Y.M. was 14.  Her family was living on Winterfield Drive.  Y.M., Y.S., and their friend Anai were outside defendant's house.  From inside the house, defendant called out to Y.M. to come inside.  After she complied, defendant pulled her into the bathroom and started kissing her. Next, he touched her jeans outside her vagina and started to unbutton them.  Y.S. started calling Y.M., so she removed defendant's hand and ran outside.  Inside the house, she had seen only defendant.

¶ 11    The next incident occurred when Y.M. was 14.  She and Y.S. were in defendant's living room, waiting for Elia to pick them up.  From upstairs, defendant called for Y.M. to help him read an English-language newspaper.  Y.M. ran upstairs and entered defendant's bedroom.  When defendant entered the bedroom, he walked past her and closed the door.  He kissed her, removed her jeans and underwear, rubbed the outside of her vagina, and started to unbuckle his jeans.  Y.S. called out to Y.M. that Elia was waiting for them.  The girls left.

¶ 12    When Y.M. was 14, defendant drove to her home on Winterfield Drive to take her and Y.S. to his home so they could play with their cousins.  As Y.M. and Y.S. waited inside, defendant entered and told Y.S. to sit in his truck.  She left.  Defendant closed the door and started kissing Y.M., then put his hand under her underwear and rubbed her vagina on the outside.  He said not to tell anyone.

¶ 13    It was unusual for defendant to pick up Y.M. and Y.S. from Winterfield Drive.  Once, defendant repeatedly texted her that he was coming over if she was home alone.  She was home alone, but she texted back that she was not at home.  He came over and repeatedly knocked on the front door.  She called Y.S.  Maria and Y.S. arrived in about 10 minutes.  Y.M. heard defendant arguing with someone outside.  Defendant never entered her house.

¶ 14    Another incident happened when Y.M. was 13.  She was in Perla's bedroom in the basement of defendant's Second Avenue home.  Feeling hungry, she left the room and saw defendant doing laundry.  She saw nobody else.  Defendant motioned for her to approach him, which she did.  He started to kiss her and touch her clothing around her vagina.  She moved away from him and went upstairs.

¶ 15    Five times, defendant exposed parts of his body to Y.M.  When she was 14, she was downstairs at his house.  He called for her to come upstairs to his bedroom. When she did, he lowered his pants and underwear and told her to touch his exposed penis.  He then pushed her down onto her knees, put his penis into her mouth, and started thrusting.  After about a minute, he put her onto the bed face down.  He lifted her shirt, and she felt something cold touch her back.  Defendant wiped off the cold substance and told her to leave the room.  Asked whether anyone else was in the house at the time, Y.M. testified, "I think they were all upstairs and I think [Y.S.] was downstairs."

¶ 16    When Y.M. was 14, she was home alone on Winterfield Drive.  Defendant was scheduled to pick her up and drop her off at his house, where Y.S. was.  When he arrived, Y.M. opened the door.  Defendant entered and started to kiss her.  She went to her room, but he followed her.  Y.M. got a Facetime call from Y.S., who wanted to know whether defendant had picked her up.  Y.M. responded that he was there already.  While Y.M. spoke on the phone, defendant started to remove her pants and underwear.  He told her to turn off the phone and pushed her face down onto her bed.  Soon, the phone's battery died, and the conversation ended.  Y.M. heard defendant undo his pants and felt something entering her "butt area."

¶ 17    On a third occasion, when Y.M. was 14, she was in the first-floor bathroom of defendant's house.  Y.S. was in the house with Jonathan.  Gabriella was in her room upstairs.  Maria was at

work and Perla was not home. After Y.M. washed her hands and opened the door, defendant entered. He closed the door, took off his pants, and gestured to her to suck his penis. She complied. After a few seconds, there were sounds of people walking in the house. Defendant buckled his pants, left the bathroom, and locked the door.

¶ 18    On a fourth occasion, when Y.M. was 14, she was in defendant's living room with Perla, Y.S., and defendant. Perla and Y.S. went out to walk the dog. Defendant started to touch Y.M. on her clothing over her vagina. A few minutes later, the door opened, and defendant pushed her back. Perla and Y.S. reentered through the front door.

¶ 19    On a fifth occasion, when Y.M. was 14, Maria told defendant to pick up Y.M. and drive her to his house, where Y.S. was already. Defendant picked up Y.M. in his truck but then went in the opposite direction of his house. He stopped the truck in an open space. He turned to Y.M., sitting in the front seat, and pulled down his pants and underwear. Y.M. saw his exposed penis. He said nothing but gestured for her to make contact. She put his penis into her mouth for a few minutes. Defendant started driving. Y.M. was about to pull away, but he told her to stay there. Soon, she pulled away. Defendant drove a little farther, stopped the truck, and told Y.M. not to tell anyone.

¶ 20    The trial court admitted photographs of Luis's house, the driveway, the garage and backyard, and the driveway area where defendant had led her during Luis's party. Y.M. marked this spot. Also admitted were photos of several areas of defendant's home on Second Avenue.

¶ 21    Y.M. testified on cross-examination that most of her cousins were at Luis's party. Usually, she and they were playing in the front yard. The front porch was next to the front yard. Most people were in the backyard, where tables were set up behind the garage.

¶ 22    The last incident of abuse by defendant occurred in the summer of 2017. Sometime after Christmas 2017, Y.M.'s family and defendant's family stopped seeing each other. The breakdown was over money. One day shortly before Christmas, Y.S. called Y.M. and told her that someone had stolen money from Elia's home. In March 2018, Y.M. told Elia about the numerous incidents of abuse by defendant. During the conversation, they also talked about the apparent theft and whether defendant had been involved.

¶ 23    Y.M. felt very close to Maria, Gabriella, and Perla and somewhat less to Jonathan. She considered Perla her unpaid babysitter when Elia was at work. Perla usually drove Y.M. around when needed. When Y.M. lived on Second Avenue, Elia would pick her up from school and drive her to defendant's home. Defendant never picked her up from school, because he was always working until either 4 p.m. or 6 p.m., usually the latter. When Y.M. arrived at defendant's home, her cousins would be there. Depending on business conditions, Elia got off work between 8 p.m. and midnight, but she generally picked up her daughters afterward. Maria worked on weekday evenings but not on weekends.

¶ 24    Shown the photographs of defendant's house, Y.M. testified that the first floor had a "shotgun layout," or open floor plan, in which one could stand in one room and see most of the other rooms. On the second floor were three bedrooms, one for defendant and Maria, one for Gabriella, and the third for Jonathan. Perla's bedroom was in the basement. The rest of the basement was an open area.

¶ 25    At Luis's house, the children played in the backyard and rarely played in the front. Defendant's house was two or three streets away. The incident that occurred when she was outside with Y.S. and Anai and defendant called her inside was probably just before Halloween. As best

she could recall, only defendant was at his house. If Jonathan was there, he was on the second floor.

¶ 26    Y.M. told her sister about defendant's abusive acts a few months to a year before she told Elia.

¶ 27    When Y.M. talked with Elia about the money theft, Y.M. became upset because people were blaming defendant. Elia blamed defendant but at one point had accused Y.M.

¶ 28    Y.M. was upset to have not seen members of defendant's family since the breakup. She missed defendant and Maria and had hoped that the matter would not get as far as a trial.

¶ 29    The State next called Y.S. She testified that, before moving to Southfield Drive in Aurora with Elia, Echeveria, and Y.M., she lived on Winterfield Drive with them. In March 2018, she, Elia, and Y.M. spoke to the police about defendant's alleged offenses. Since then, she had not seen defendant, Maria, or their children until coming to court. Before March 2018, she saw them almost every weekend, usually at their house. Other than on holidays, Elia was not usually there. Sometimes, Y.M. and Y.S. would be in different parts of the house and not see each other.

¶ 30    At one time, when Y.S. was at defendant's house with Maria, Y.M. phoned her from another location and complained about defendant. Maria drove Y.S. to her home on Winterfield Drive. When they arrived, she saw that Y.M. and defendant were outside arguing. Maria asked defendant why he was there and told him he had no business being there.

¶ 31    Defendant frequently drove to Winterfield Drive to pick up Y.S. and Y.M. Sometimes, when defendant dropped them off at their home, he would tell Y.S. either to wait in the car while he went inside to use the bathroom or to go inside first because he had to talk to Y.M.

¶ 32    At times, Y.S. would communicate through Facetime. Once, while defendant was driving Y.M. somewhere. Y.M. made a Facetime call to Y.S., who was downstairs at defendant's house.

Y.M. said that defendant was making her uncomfortable. Gabriella called Y.S. from upstairs, and Y.S. left the room without the phone. When she returned, the Facetime call had ended.

¶ 33    Shortly before Christmas 2017, while the girls were in defendant's car, he told Y.M. to stay in the front seat while Y.S. went inside. Later, Y.S. asked Y.M. about the incident. Y.M. initially said that defendant had wanted to talk to her about a Christmas gift but then told her something else (counsel interjected before Y.S. could specify).

¶ 34    When Y.S. went to the police station in March 2018, she spoke with Kristin Temple with the Department of Children and Family Services (DCFS). They discussed a SnapChat exchange about accusations of some sort. Someone had stolen something from Y.S.'s home. Although her family was not sure who did it, they were accusing defendant because a neighbor's camera had shown that his car was parked in the lot of their apartment complex for two hours while they were not home.

¶ 35    Gabriella and Perla alternated using the basement bedroom. The first-floor plan was basically open. Y.S.'s cousins were there most, but not all, of the time that Y.M. and Y.S. were there. Defendant would return from work late at night.

¶ 36    Elia testified that Y.M. was born October 12, 2002, and Y.S. was born May 18, 2005. In March 2018, after talking with her daughters, she took them to the police station. Y.M. was nervous, afraid, and crying. Next, they went to the Child Advocacy Center.

¶ 37    In March 2018, defendant lived on Second Avenue with Maria (Elia's sister) and their three children. Before then, Elia worked five days a week, including some weekends, and Maria took care of Y.M. and Y.S. at those times. Under this arrangement, Elia understood that Maria, Perla, and sometimes Jonathan would babysit her daughters. However, at times she would drop her daughters off at defendant's home when she knew that only defendant would be home. Also,

defendant would have contact with her daughters when he went to her home when she was not there. Elia did not always know in advance when defendant would go to her house while her daughters were home alone.

¶ 38 Sometime in 2017, Elia and Maria got into a dispute about accusations relating to money belonging to Echeveria that someone had stolen from Elia's home in November or earlier that year. Elia might have asked Y.M. about the money, but she never accused her of stealing it. She did not know of Y.M. posting anything on social media about the matter. After Maria found out that Elia had accused defendant of the theft, Maria and Y.M. were still close and talking to each other. During a conversation about the money theft, Y.M. told Elia about defendant's acts of abuse. Later, Elia told police investigator Chris Tunney that she believed that defendant had stolen the money.

¶ 39 Defendant and Maria resided near Luis' house. During her fifth-grade year, Y.M. also lived within a block of Luis. At that time, Elia dropped off her daughters at defendant's home from Monday through Friday before going to work. Most weekdays, defendant and Maria were at work, but their three children were home, and Elia left Perla or Gabriella in charge of babysitting for pay. Elia picked up the children whenever she finished working, generally at 9 or 10 p.m., but sometimes on weekends, when she got off very late, she would let them stay overnight.

¶ 40 Luis hosted parties at his home. The men usually gathered on a cement area near the garage or a grassy area behind it. The children did not play outside in front but instead in the garage or on the grass nearby. The garage was attached to a driveway, which ran alongside the house and was wide enough to fit one car. Behind the house, the driveway was wide enough to side-by-side park two or three vehicles. Elia recalled Luis holding a cotillion for his daughter. Perhaps 40 people attended, most of them outside.

¶ 41    Before the money incident, Elia's relationship with Maria had been good.  However, Elia and her daughters suffered from losing touch with defendant's family.  After she told Maria about Y.M.'s accusations about defendant, Maria stopped talking to her, not the other way around.

¶ 42    Perla testified that, before moving out a year before the trial, she resided with defendant and his family for nine years.  He was her stepfather, and she had known him since she was three. In 2008, Elia and her daughters came to Aurora.  In 2011, defendant's family moved to Second Avenue, and Elia's family moved to an apartment complex on the west side.  For three or four years before March 2018, Perla was working, but she saw Y.M. and Y.S. every weekend while Elia was at work, sometimes on weekday evenings, and during holidays or family events.

¶ 43    In March 2018, Perla spoke to Tunney outside defendant's house.  Tunney told her that he was recording their conversation.  Perla told Tunney that, when she and Y.S. returned to the house after playing with the dogs, she saw defendant and Y.M. sitting on the living room couch, three or four feet apart.  Perla did not recall telling Tunney that she saw Y.M. lying down or that she saw defendant move away from Y.M.  Perla did not confront them there, because her brother and sister were upstairs.  Instead, she called Y.M. to her bedroom downstairs and asked her whether defendant had ever disrespected her.  Y.M. said no.  Perla could not recall telling the investigator that something about the situation did not seem right or normal.  Perla did not believe that defendant had abused Y.M., but she did not know whether she told the investigator that she was unsure on this point.  She told Tunney that she wondered whether Y.M. had instigated the sexual conduct or provoked defendant into abusing her, but Perla admitted that she was guessing.

¶ 44    Perla testified that Elia's daughters were at her home every weekend and that defendant would see them then.  Defendant drove the girls to and from their home on Winterfield and to stores, but only on the rare occasions when Maria and Gabriella were unavailable.  On some but

not all of these occasions, defendant would be alone with the girls, but other times Jonathan was also there. However, Perla admitted that she told Tunney that it was normal for defendant to be alone with the girls.

¶ 45    Perla testified on cross-examination that her family lived at Luis's house with Elia and her daughters from 2008 to 2011. The backyard was behind the garage and not nearly big enough for 10 children to play there. The garage driveway was wide enough for one car. Perla went to Luis's house for the party in honor of his daughter. About 50 or more people were there, between 10 and 20 of whom were children. Gabriella supervised the youngsters, who were always playing together in the backyard or on the front porch. Perla identified the admitted photographs showing the property.

¶ 46    Perla testified that, at the house on Second Avenue, the front door opened into the living room, from which one could see the kitchen. Since 2014, Perla had worked the same job from 7:30 a.m. to 4:30 p.m., getting home by 4:45 or 5 p.m. Defendant got home at 6:30 p.m. Jonathan came home from school at about 3:30 p.m., and Gabriella would watch him until an adult came home. Perla's bedroom was in the basement, and she was usually either there or in the living room.

¶ 47    Shannon Krueger testified as follows. She was a pediatric nurse practitioner whose duties included conducting sexual-assault examinations. On April 12, 2018, she examined Y.M., who told Krueger that her uncle had sexually abused her. A physical exam revealed nothing abnormal, which neither confirmed nor negated possible sexual abuse. Lab test results were also negative.

¶ 48    Maria testified on direct examination as follows. Defendant was her husband and Elia was her sister. In March 2018, Elia and the police told her of the allegations against defendant. Defendant was in Mexico at the time. She sent him money so that he could return home early. In

the three or four previous years, she had been in regular contact with Y.M., as she and Y.S. were at her house every weekend. She also saw them at family gatherings but seldom on weekdays. On some weekends, defendant and Y.M. were both at the house. Defendant picked up Y.M. and Y.S. when Maria and Gabriella were unavailable. Between 2015 and 2108, when Y.M. and Y.S. came to her house, they never slept over. Previously, they sometimes slept over in the living room.

¶ 49    Maria recalled that, in December 2017, Y.S. was at defendant's house and asked Maria to drive her home. Maria did so and, when she arrived, defendant was sitting in his truck in the parking lot. Y.M. was not outside. Maria asked defendant why he was there. He told her that Y.M. had called him and asked him to drive her to his house, where his sister was at the time. Maria and defendant drove back home, but Y.M. and Y.S. stayed at their home. Arriving home, Maria asked defendant why he had been at Y.M.'s home. She testified that they did not have an argument and did not recall having told an investigator they had. Maria told defendant, "[D]on't do good things that look bad," because he had not told her in advance that he was going to Y.M.'s home. She was not concerned that defendant had done something inappropriate at Y.M.'s home.

¶ 50    Tunney testified that, in March 2018, she became the primary investigator into Y.M.'s allegations. She contacted defendant and members of his family. On March 30, 2018, she spoke with defendant and Jonathan after they left their home. Defendant told her that he would come in for an interview that afternoon, but he did not appear, and she was unable to locate and contact him. On April 5, 2018, Tunney spoke to Perla. Perla told her that she once returned from walking the dog and saw defendant sitting next to Y.M., who was lying on the couch. Perla told Tunney that it did not look right to her and that she asked Y.M. whether defendant had been touching her.

¶ 51    Flora Amezcua testified that she worked for DCFS and investigated reports of neglect and abuse. In May 2018, she recorded an interview with Maria. Maria told her about her confrontation

with defendant outside Y.M.'s home. She said that, after they got home, she told him that he had "better not have been doing anything stupid" at Y.M.'s home. When Amezcua asked Maria why she said that, she replied that she "didn't trust anyone."

¶ 52    The State rested. The trial court granted defendant directed findings on counts II, III, VII, VIII, and IX. In denying directed findings on the remaining counts, the court explained that there was sufficient evidence that (1) in his living room, defendant placed his mouth on Y.M.'s vagina (count I); (2) defendant placed his hand over Y.M.'s clothing covering her vagina (count IV); (3) in his bedroom, defendant placed his penis into Y.M.'s mouth (count V); and (4) in his bathroom, defendant placed his penis into Y.M.'s mouth (count VI).

¶ 53    In defendant's case, Luis testified that he was the brother of Elia and Maria. In May 2015, Luis hosted a cotillion for his daughter at his home on Benton Street. He held the party between 4 and 11 p.m. in the garage and nearby patio. Including Maria and defendant, 40 to 50 people attended. Luis's nieces and nephews attended and played in front of the house, away from the adults. The children could not play in the backyard, because there was a fence with a little path There were perhaps three cars in the driveway, which was clearly visible from the attached patio and garage. Luis was present most of the time, greeting guests. At no time did Luis see defendant alone with any of his (Luis's) nieces during the cotillion. Most of the time, Luis saw defendant close to him.

¶ 54    Jonathan testified as follows. He was 19 years old. When in middle school and high school, he usually came home at about 3:30 p.m. and would be alone for an hour or two until either Gabriella or defendant came home. He and Y.M. attended the same middle school, and Y.S. attended a school near his house. The three arrived at about the same time as he did. He spent time with them in the living room or his bedroom, where he always kept the door open. Gabriella

was usually home, but Maria generally came home much later, and Perla was living elsewhere at the time. Jonathan often went to the park with Y.M. and Y.S. and sometimes Gabriella. He never saw anything troubling from defendant. Defendant always came home tired and did not unduly disturb Jonathan.

¶ 55    During winter vacation in 2017-2018, he helped defendant remove a carpet from his home and install wood flooring. They threw away the carpet in a dumpster at Elia's apartment complex.

¶ 56    Gabriella testified that defendant was her stepfather. Between 2013 and 2018, she resided in his Second Avenue house. After graduating from high school in 2014, she did not work outside the home except to babysit Y.M. and Y.S. Elia paid her about $120 a week to babysit. On weekdays, she usually babysat between 4 p.m. and 9 or 10 p.m., when she would drive them home, or Elia would pick them up. On weekends, it could be any time. Maria was not home on weekdays when the girls were there, because she worked very late. Monday through Saturday, defendant came home from work at 6 p.m. Perla sometimes came home by 5:30 p.m. and occasionally visited her boyfriend in the evening.

¶ 57    Gabriella stopped caring for her cousins after moving to Winterfield Drive in 2016. Since the accusations against defendant, she had not spoken to them. Her cousins never accused her of wrongdoing, but they accused a family member of stealing money from Elia's home. In response to the allegation, Gabriella went on SnapChat in March 2018 and posted, "[Y.M] and [Y.S.], don't accuse my dad of stealing money when I have proof that he did not ***."

¶ 58    Before Elia's family moved to Winterfield Drive, there were times when Y.M. was over at defendant's house while he was there. After the move, Gabriella stopped babysitting them, but they continued to come over. Sometimes, defendant was there too. However, Gabriella did not believe that defendant picked the girls up from their home more than twice.

¶ 59    Defendant testified on direct examination as follows. Between 2015 and 2018, he resided on Second Avenue and worked six days a week, finishing at 6 p.m. In March 2018, when he was in Mexico, Maria told him about Y.M.'s accusations, and he decided to cut his trip short and return the next day. When he returned, he stayed at his house and went to work as usual. When he encountered the detective in the parking lot, defendant told her that he could go to the police station that afternoon but later decided not to, because it would be better to hire an attorney.

¶ 60    Defendant never touched Y.M. on her vagina, used his fingers on her vagina, or put his penis into her mouth. Asked whether he ever exposed himself to her, he testified, "I have never touched [Y.M.]." Asked, "Were there times [when he was] alone with [Y.M.]," he testified, "No." When he gave Y.M. a ride, it was because she had asked for a ride, and Y.S. went along also.

¶ 61    In December 2017, defendant drove to Y.M.'s house because she called; he asked her why she did not get a ride with Maria or Gabriella, and she responded that nobody was answering her calls. When defendant arrived at Y.M.'s home, he called to tell her he was outside. In a few minutes, Maria showed up. She and defendant did not argue.

¶ 62    Shortly before Thanksgiving 2017, defendant heard through Maria's mother that he had been accused of stealing money from Elia's home. Between Thanksgiving and March 2018, he removed the carpeting from his house. At Elia's invitation, he discarded the carpeting in dumpsters outside her apartment complex.

¶ 63    Defendant never broke into Elia's home, never tried to touch Y.M. in any sexual way in Elia's home, never invited Y.M. into his bedroom, and never took her to his basement.

¶ 64    Defendant never asked Y.M. for help reading English-language newspapers; if he needed help, he would have asked Perla. Y.M never read any newspapers to him. He never asked her to

come to his bedroom to help him with anything. When Perla saw him on the living room couch with Y.M., he had not touched Y.M. At times in the past, he had hugged Y.M.

¶ 65    Defendant rested. The State put on no rebuttal.

¶ 66    The trial court found defendant guilty of the four remaining charges. The court explained as follows.

  a) Count I was supported by Y.M.'s testimony that, when she and Y.S. were staying overnight at defendant's house, she saw that her pants and underwear had been pulled down and that defendant's mouth was on her vagina.

  b) Count IV, which alleged that defendant placed his finger on Y.M.'s sexual organ, was supported by "evidence that this happened more than once." However, the court specifically referenced the incident at Luis's outdoor party—Y.M. testified that defendant rubbed her vagina over her clothes, albeit only for a few seconds until someone called for Y.M., and she left. The court noted the evidence that numerous people were present in the area, but it found that the incident happened as Y.M. described it.

  c) Count V, which alleged that defendant placed his penis into Y.M.'s mouth, was supported by Y.M.'s testimony that, when she was downstairs at defendant's house, he called her up to his bedroom, exposed himself, pushed her down, and placed his penis into her mouth. In addition, the court noted that Y.M. testified explicitly about what happened before, during, and immediately after the act of penetration.

  d) Count VI, which alleged conduct similar to count V, was supported by the evidence that, while Y.M. was in the first-floor bathroom of defendant's house, he entered the room, closed the door, and placed his penis into her mouth. He stopped after a few seconds and left because he heard other people walking in the house.

¶ 67    The court explained more generally that, having observed Y.M., defendant, and the other witnesses testify, it found that "[Y.M.] was credible in her testimony." Y.M. gave "very detailed accounts" of the incidents, was "straightforward on the stand," and "appeared in court to be sad to be [there]." She was sad that defendant had been accused of stealing money, and she had not thought that the matter would end up in court. She "had a very specific memory regarding what happened at each incident she described."

¶ 68    Further, there was corroboration for Y.M.'s testimony about the bedroom incident. Y.M.'s testimony that she felt something cold on her back was evidence that defendant had ejaculated on her after the act of penetration. The court continued, "And with a girl of that age, unless that had actually happened to her, I don't know why she would be able to talk about that."

¶ 69    By contrast, "defendant's testimony was not particularly credible." Moreover, there were ample opportunities for him to commit the charged acts, as Maria was not around on weekdays until 10 p.m. and Y.M. and Y.S. were at his home on many weekends while Elia was working.

¶ 70    After a hearing, the trial court sentenced defendant to consecutive prison terms of four years on each of counts I, V, and VI and three years on count IV, for an aggregate sentence of 15 years. He timely appealed.

¶ 71                                    II. ANALYSIS

¶ 72    On appeal, defendant contends that the evidence was insufficient to prove him guilty beyond a reasonable doubt of any of the offenses of which he was convicted. Defendant contends generally that Y.M.'s testimony was uncorroborated by other witnesses or any physical or medical evidence. He contends more specifically that her account of each incident on which a conviction was based was so inherently implausible that the trial court could not reasonably find him guilty. The State responds that the trial court properly found Y.M. credible and defendant not credible

and that, although corroborating evidence was not strictly needed, there was substantial evidence that defendant had ample opportunity to commit each offense.

¶ 73    Initially, we set out the basic principles of our review. When faced with a challenge to the sufficiency of the evidence, we ask only whether, after viewing all of the evidence in the light most favorable to the prosecution, any rational fact finder could have found the elements of the offense proved beyond a reasonable doubt. *People v. Ward*, 154 Ill. 2d 272, 326 (1992). The fact finder is responsible for determining the witnesses' credibility, weighing their testimony, and deciding the reasonable inferences to be drawn from the evidence. *People v. Hill*, 272 Ill. App. 3d 597, 603-04 (1995). It is not our function to retry the defendant. *People v. Lamon*, 346 Ill. App. 3d 1082, 1089 (2004).

¶ 74    Here, the court convicted defendant of criminal sexual assault (720 ILCS 5/11-1.20(a)(3) (West 2014)) (counts I, V, and VI) and aggravated criminal sexual abuse (*id.* § 11-1.60(b)) (count IV). A person is guilty of the former as charged here if he commits an act of sexual penetration, he is a member of the victim's family, and the victim is under 18 years of age (*id.* § 11-1.20(a)(3)). A person is guilty of the latter as charged here if he commits an act of sexual conduct (see *id.* § 11-1.50) and the victim is under 18 years of age and a family member (*id.* § 11-1.60(b)).

¶ 75    Defendant does not dispute that the testimony of Y.M., if credible, proved all the elements of his convictions. He argues, however, that her testimony was uncorroborated and so inherently implausible that the trial court exceeded its prerogative in finding him guilty of any offenses. Defendant makes both specific attacks on the evidence for each conviction and general attacks on the evidence as a whole. We consider these arguments in turn.

¶ 76    On count I, defendant argues that Y.M.'s account of the incident was implausible. He reasons that it was "extremely unlikely" that he would have attempted to remove Y.M.'s pants and

underwear and touch her with another person nearby who could be roused from her sleep by his actions. However, improbability does not create reasonable doubt if the testimony, viewed in the light most favorable to the prosecution, is sufficient to establish the offense. Y.M.'s testimony on count I was straightforward, clear, and consistent, and the trial court credited it. We note that defendant acted at night—when other household members were asleep—in a room occupied by two minors, both of whom, even if they awoke, could be intimidated or embarrassed into keeping silent about the act. The evidence was sufficient on count I.

¶ 77    Regarding count IV, defendant contends that, given the setup and number of guests at the cotillion Luis hosted, it was improbable that there would have been no witness to his alleged act of rubbing Y.M.'s vagina over her clothes. However, Y.M. testified that the conduct occurred at Luis's house during a family barbecue, not a cotillion. In addition, the trial court noted the evidence regarding the presence of numerous people but found that the incident happened as described by Y.M. The trial court found Y.M. to be credible and defendant to be otherwise. Accordingly, the evidence was sufficient on count IV.

¶ 78    On count V, defendant's challenge appears to conflate (a) the bedroom incident on which the trial court relied with (b) either of the incidents in the basement and (c) the Facetime incident, the latter of which was not the basis of any conviction. In any event, the evidence was sufficient, as the trial court noted that Y.M. not only testified clearly and consistently about the encounter but did so in detail, including describing defendant's ejaculation onto her back.

¶ 79    Finally, on count VI, defendant contends in a general way that the circumstances made Y.M.'s testimony implausible. Still, the trial court could consider that (1) the criminal act occurred inside a closed bathroom in the basement, away from where most of the family (if at home) would be present, (2) defendant stopped after only a few seconds because he heard other people walking

nearby, and (3) there was nothing so inherently implausible about this account that the trial court could not find it proven beyond a reasonable doubt.

¶ 80 We turn to defendant's more general attacks on the evidence. He contends that Y.M.'s testimony was uncorroborated by other witnesses or by any physical or medical evidence. However, as defendant concedes, the factfinder may find guilt beyond a reasonable doubt based on the positive testimony of a single credible witness. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). Our supreme court has long dispensed with the special rule that, in a sexual-offense trial, the victim's testimony is insufficient unless it is "clear and convincing or substantially corroborated." *People v. Schott*, 145 Ill. 2d 188, 202 (1991). The trial court found Y.M. credible, and her testimony was positive and consistent on the charges on which defendant's convictions were based.

¶ 81 Defendant contends second that Y.M.'s testimony was insufficient because she had a motive to accuse defendant falsely, *i.e.*, to get revenge against him for stealing the money from Elia's home. Defendant notes that Y.M. told Elia about defendant's abusive actions during a conversation that started on the subject of the alleged theft. Defendant's argument did not sway the trial court, and we may not substitute our view of the evidence (or defendant's view of it) for that which the trial court took. Moreover, there was evidence from both Y.M. and Y.S. that Y.M. told her sister about the incidents months before the March 2018 conversation with Elia. Further, Y.M. testified that she had been close to defendant and regretted being separated from him, and Elia testified that, during the March 2018 conversation, Y.M was upset to the point of crying. Defendant has not persuaded us to disturb the trial court's exercise of its fact-finding prerogative.

¶ 82                                III. CONCLUSION

¶ 83 For the foregoing reasons, we affirm the judgment of the circuit court of Kane County.

¶ 84     Affirmed.